**In the Matter of the Protective Proceedings of TAMMY J.**

**No. S-13698.**

Supreme Court of Alaska.

March 2, 2012.

**14.** 636 P.2d 47, 52 n. 5 (Alaska 1981).

**15.** *Id.* at 52 (emphasis added).

Ted Stepovich, Law Office of Ted Stepovich, Fairbanks, for Appellants Theresa H. and Jeff J. (limited appearance for oral argument).

Elizabeth Russo, Assistant Public Advocate, and Rachel Levitt, Public Advocate, Anchorage, for Amicus Curiae Public Guardian, Office of Public Advocacy.

Meg K. Allison Zaletel, Leslie A. Jaehning, and Mark Regan, Anchorage, for Amicus Curiae Disability Law Center of Alaska.

Laura C. Bottger, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Amicus Curiae State of Alaska.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

The parents of a developmentally disabled adult woman appeal the superior court's decision to appoint the public guardian, rather than the parents, as the woman's legal guardian. The superior court found that the parents failed to take advantage of resources available for the daughter's development and did not support the daughter's contact with extended family. The parents appealed. The parents argue that they should have been appointed as guardians and that the appointment of a public guardian, in the absence of clear and convincing evidence that the parents were unfit to serve as guardians, violated their constitutional right to parent their child. Because the superior court did not abuse its discretion in appointing the public guardian, and because the superior court's action did not violate the parents' substantive due process rights under the 14th Amendment, we affirm the decision of the superior court in all respects.

## II. FACTS AND PROCEEDINGS

### A. Facts [1]

Tammy J.[2] was born in 1990. She is the daughter of appellants Theresa H. and Jeff J. (collectively "Tammy's parents") from the Kotzebue area. Tammy is developmentally disabled. The parties do not contest that Tammy functions at roughly the level of an eight- or nine-year-old and is incapacitated to an extent warranting the appointment of a guardian.

According to Theresa, the family moved to Anchorage after Tammy's birth to be closer to medical facilities for Tammy. Approximately two years after Tammy's birth, Theresa and Jeff divorced, but the record suggests that they have continued to share responsibility for raising Tammy. Theresa worked on the North Slope in three-week shifts, and Tammy would stay with Jeff while Theresa was away.

Tammy attended special needs programs in elementary school, middle school, and high school. But school personnel reported that Tammy last attended school with any regularity in the 2006–2007 school year. According to the Court Visitor Marieann Vassar, Tammy's former high school teacher stated that Tammy "appeared to be very happy when she was in school." The teacher also reported that Tammy

> had some long periods of absence due to a chronic lung condition, but [the teacher] also believed [Tammy] missed a significant amount of school to babysit her sister's child in Anchorage. . . . [Tammy] was suc-

1. The superior court adopted the probate master's recommendation, and the probate master adopted the recommendation of the court visitor. The following factual summary relies heavily on facts from the court visitor's preliminary report and addendum, except where those facts were later contested.

2. We use pseudonyms for the parties to protect the family's privacy.

cessful at a couple of supported job sites.... [Theresa] responded when contacted by the school and seemed concerned about [Tammy].... Her family was slow to obtain hearing [aids] for her, which impacted her ability to progress.

At some point prior to the commencement of proceedings, Tammy went to stay with her sister, Marcy D., and Marcy's husband, Jack. The record is unclear regarding when her stay began, why, how long it lasted, and how frequently it was interrupted. But in general, Marcy and Jack claim that Tammy stayed with them for a year and a half in 2007 and 2008, while Tammy's parents claim that Tammy stayed with Marcy and Jack for only six weeks when Theresa was working on the North Slope and Marcy was recovering from a difficult pregnancy and needed assistance.

According to Jack, Tammy said during the visit that she wanted to go back to school, so Marcy and Jack tried to enroll her for services at the Arc of Anchorage. An Arc employee later reported to the court visitor that Marcy and Jack "seemed genuinely interested in getting support services for [Tammy], but ... [Theresa] seemed resistant, and didn't appear to see a need for services." Jack stated that he and Marcy had difficulties in obtaining the necessary information from Theresa in order to complete the enrollment.

On August 7, 2008, after Marcy and Jack discovered what they believed to be evidence that Tammy's parents were misusing Tammy's Social Security benefits, Marcy petitioned for sole guardianship and conservatorship of Tammy. (The Social Security Administration later determined that Tammy's parents were not misusing Tammy's benefits.) On August 13, 2008, Theresa picked up Tammy from Marcy and Jack's home. According to Marcy and Jack, Theresa then announced that Tammy would not be returning and that they would never see Tammy again.

## B. Proceedings

As noted above, Marcy filed a pro se emergency petition for appointment of a temporary guardian for Tammy on August 7, 2008, while Tammy was still staying in Marcy and Jack's home, and apparently without the knowledge of Tammy's parents. The petition claimed that Tammy "needs regular team medical attention" but that "due to ... relu[c]tance from her mother [Tammy] has not been receiving care she needs." The petition also claimed that "[t]here is a history of domestic violence in the home of her parents and she frequently requests to not go back to [her] parents's home," and that Tammy had been living with Marcy and Jack for "approximately (more than) one year." In her accompanying petition to be appointed Tammy's guardian and conservator, Marcy listed herself as Tammy's "representative payee" for Social Security and other benefits, and identified her mother's address as "transient, in Alaska."

Probate Master John Duggan determined that there was no medical emergency justifying a hearing within 72 hours and scheduled an expedited hearing for September 2, 2008. In the interim, Court Visitor Marieann Vassar assembled a preliminary report on Tammy's affairs, based on contact with over a dozen individuals acquainted with Tammy. The court visitor's report concluded with a recommendation that the Office of Public Advocacy be appointed Tammy's temporary full guardian. After the September 2, 2008 hearing, the probate master appointed the Office of Public Advocacy as a temporary conservator for Tammy.

An evidentiary hearing took place on December 4, 2008, to resolve Tammy's guardianship and conservatorship. Tammy's parents arrived with representation, while Marcy and Jack continued to appear pro se. Because Marcy and Jack's case required more time than expected, the probate court scheduled a further hearing for February 19, 2009. The probate master also encouraged Tammy's parents and Marcy and Jack to agree on a time and place when Tammy could spend time with Marcy and Jack's young daughter in a neutral setting.

The February hearing was largely consumed by disputes regarding (1) the failure of the parties to arrange a visit between Tammy and Marcy and Jack's daughter around the holidays; (2) the last-minute ex-

change of exhibits; and (3) Tammy's parents' unsuccessful attempt to replace Tammy's court-appointed attorney, Chad Holt of the Office of Public Advocacy, with Lisa Nelson, an attorney from the same law firm as their own counsel, Suzanne Lombardi.

Unable to proceed with the evidentiary hearing, the probate master detailed a more specific plan for a visit between Tammy and Marcy and Jack the following Sunday, February 22, 2009. When this meeting failed to take place, the probate master ordered another visit for March 29, 2009, which also apparently never happened. Marcy and Jack also stated that Tammy's parents had failed to follow the probate master's recommendation of a visit for their daughter's birthday on March 14, 2009.

During this period, Tammy's parents cross-petitioned to be appointed as Tammy's guardian and conservator. After some delay, partly due to Tammy's parents' substitution of counsel, the fourth and final hearing took place on August 12, 2009. Probate Master Duggan heard the remaining evidence and witnesses. On August 24, 2009, the probate master issued a report in which he adopted the court visitor's recommendation that a public guardian be appointed Tammy's full guardian with conservator authority.

Tammy's parents objected, arguing among other things that "[t]he probate court has substituted [its] view and decision making for [that of] the parents and that violates the parents' constitutional right to parent their own child." Tammy's attorney, Chad Holt, joined in the parents' objections. After considering Tammy's parents' objections, Superior Court Judge Peter A. Michalski adopted the master's recommendation, emphasizing "the utter failure of the mother of the inca-

pacitated person to develop resources or take action for her."[3]

Tammy's parents appeal.

## III. STANDARD OF REVIEW

 "The ... selection of a guardian or conservator for an incapacitated person is committed to the sound discretion of the superior court. We review that decision for abuse of discretion."[4] Specifically, "[t]he superior court abuses its discretion if it considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors."[5] Constitutional claims are questions of law to which we apply our independent judgment.[6] "As with all questions of law, we will adopt the rule that is most persuasive in light of precedent, reason, and policy."[7]

## IV. DISCUSSION

Tammy's parents raise two points on appeal. First, they argue that the trial court failed to apply the preference for parents in guardianship appointments as required by AS 13.26.145. Second, they argue that the trial court erred in concluding that the constitutional right to parent a child dissolves when the child reaches the age of majority, especially in cases where the adult child is developmentally disabled.

### A. The Superior Court Did Not Abuse Its Discretion Under AS 13.26.145 By Appointing The Public Guardian For Tammy.

 Alaska Statute 13.26.145 contains the factors that Alaska's legislature has provided as guidance for courts in selecting a guardian. Subsection (d) establishes an order of priority—"parent of the incapacitated person" appears third in the list, while "the public guardian" appears seventh and last.[8]

---

3. Judge Michalski also noted that Tammy's public guardian could follow Tammy's preference for placement with her mother.

4. H.C.S. v. Cmty. Advocacy Project of Alaska, Inc., 42 P.3d 1093, 1096 (Alaska 2002) (citations omitted).

5. Id. at 1096 (citing S.N.E. v. R.L.B., 699 P.2d 875, 878 (Alaska 1985)).

6. Bailey v. State, Dep't of Corr., Bd. of Parole, 224 P.3d 111, 116 (Alaska 2010) (citing Covington v. State, 938 P.2d 1085, 1089 (Alaska App.1997)).

7. Id. (citing Lewis v. State, 139 P.3d 1266, 1269 (Alaska 2006)).

8. AS 13.26.145(d).

As Tammy's parents concede, the statute also "give[s] the appointing court discretion to override the statutory preferences."[9] As most recently amended, the statute provides:

(f) When in the best interest of the incapacitated person, a court may decline to appoint a person who has priority under (d) of this section as guardian of an incapacitated person and may appoint as guardian a person who has a lower priority than another person or who does not have a priority. If the court appoints a person with a lower priority under (d) of this section than another person, the court shall make appropriate written findings related to why the best interests of the re-

spondent require appointment of the person with a lower priority.[10]

█ The Alaska legislature has provided further guidance in AS 13.26.090, which addresses the general purpose and basis for guardianship. As we have noted, "guardians for incapacitated persons are appointed to 'promote and protect the well-being of the person.'"[11] "Guardianship for an incapacitated person . . . shall be designed to encourage the development of maximum self-reliance and independence of the person. . . ."[12] It is clear that the legislature intended one of the primary underlying goals of guardianship for a developmentally disabled ward to be the promotion of the ward's autonomy and individual development.[13]

9. Tammy's parents' brief on appeal discusses both AS 13.26.145 (guardianship priorities) and similar provisions in AS 13.26.210 (conservatorship priorities). The superior court's order merges the roles of guardian and conservator, adopting the probate master's recommendation that "the Office of Public Advocacy Public Guardian be appointed as full guardian including conservator authority." Because Tammy's parents did not raise an objection to the conservatorship assignment either in their Points on Appeal or prior to appeal, even though they were represented by counsel at trial, we treat their objection to the conservatorship assignment as waived. "[A] *pro se* litigant who fails to raise an issue below should not be able to raise the issue on appeal absent plain error." *Maness v. Daily,* 184 P.3d 1, 9 n. 25 (Alaska 2008) (quoting *Thoeni v. Consumer Elec. Servs.,* 151 P.3d 1249, 1257 (Alaska 2007)).

10. AS 13.26.145(f). In 2008, the legislature added the second sentence to the subsection. Ch. 53, § 20, SLA 2008. As the Director of the Office of Public Advocacy explained to the Senate Labor and Commerce Committee, the order of priority for who should be appointed as a guardian or conservator

starts with the person requested by the respondent, then the spouse, then the adult child or parent, then a relative, family friend, private guardian and then finally, as a last resort, the Office of Public Advocacy. This change simply asks that the court make written findings as to why someone was appointed. Sometimes . . . family members exploit the protected person or were part of the problem and yet after the appointment [of a guardian] they are at his door trying to micromanage the ward's affairs. This gives his office a written record of why that person was not appointed. Making the court explain what it is doing is just good policy.

Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 101, 25th Leg., 2nd Sess. (Jan. 25,

2008) (comments of Josh Fink, Director, Office of Public Advocacy). Prior to 2004, subsection (f) did not exist, and subsection (e) stated that "priorities established in (d) of this section are not binding, and the court shall select the person, association, or nonprofit corporation that is best qualified and willing to serve." AS 13.26.145(e) (repealed and reenacted by ch. 84, § 17, SLA 2004); *see H.C.S.,* 42 P.3d at 1097. The 2004 amendments can be found in H.B. 427.

The 2004 amendments appear to have been motivated in general by a desire to provide greater protection for Alaskan wards. *See* Minutes, House Health, Education & Social Services Comm. Hearing on H.B. 427, 23rd Leg., 2nd Sess. (Apr. 1, 2004) (sponsor statement by Jim Shine, Staff to Representative Tom Anderson, Alaska State Legislature) (advocating regulation of private guardians and conservators because "[v]ulnerable and incapacitated adults are easy prey for those wishing to exploit their resources" and because of need for "minimum qualifications and standards"). None of the testimony at the hearing suggested a concern for infringing the rights of potential guardians or conservators to be appointed to those roles.

11. *H.C.S.,* 42 P.3d at 1099 (quoting AS 13.26.090).

12. AS 13.26.090.

13. *See* AS 13.26.116(c) ("The guardianship plan shall be designed to encourage a ward to participate in all decisions that affect the ward and to act on the ward's own behalf to the maximum extent possible."); AS 13.26.117 ("The primary goal of the program described in the report must be, to the maximum extent possible, to develop or regain the ward's abilities to handle the ward's own affairs."); AS 13.26.150(a) ("[T]he guardian shall encourage the ward . . . to develop or regain, to the maximum extent possible, the capacity to meet the essential requirements

By contrast, nowhere in Alaska's guardianship statutes, AS 13.26.090–.150, and thereafter, does the legislature suggest that the interests of family members should be considered in choosing a guardian. The best interests of the ward appear to be paramount.[14] The legislature may have given relative priority to close family in the appointment of guardians for the same reason that Missouri did in its guardianship priority scheme, not out of concern for the interests of the potential guardian but because "a relative is likely to be more solicitous than a stranger in providing care for the incapacitated." [15]

In the present case, the superior court adopted the probate master's recommendation "that there is good and overriding cause to appoint the Public Guardian." [16] In support of this statement, the probate master focused on two considerations. First, he found "no credible evidence" that Theresa would provide Tammy with "reasonable access ... [to] her extended family." He based this conclusion partly on Theresa having "clearly subverted" an earlier agreement with the probate court to provide such access, and partly on Theresa being "not credible in her testimony that she supported and encouraged [Tammy's] access to extended family including her sister ... and [her sister's] children." Second, the probate master found the extent of Tammy's parents' efforts to "obtain services ... or other ... vocational and life skills training" for Tammy inadequate "in view of [Tammy's] important needs,

young age and the ready availability of such services."

In adopting the probate master's recommendation, the superior court responded to Tammy's parents' objections, including the suggestion that Tammy wished to remain under the care of her parents:

> It is important to consider the respondent's preferences and yet that is only one consideration. The "standard" for appointing a guardian other than a parent for an adult is different than the considerations related to custody of a biological minor child. Here the utter failure of the mother of the incapacitated person to develop resources or take action for [Tammy] supports the master's recommendation very strongly. The father is incapable of driving the child to needed services and the mother is gone three [weeks] and then back three weeks. The adult respondent needs more help than is or can be given by her parents.

> All this said, the guardian is not prevented from determining that [Tammy's] preference for placement with her mother is appropriate.

The superior court's reasoning, and the probate master's reasoning behind it, faithfully took account of the factors mandated by AS 13.26.145. The superior court recognized the generic priority for parental over public guardians, but declined to apply it in this case because a public guardian would be in the best interests of the incapacitated per-

---

for physical health or safety, to protect the ward's rights, and to manage the ward's financial resources."); AS 13.26.150(c)(1) (The guardian "shall assure that the ward has a place of abode in the least restrictive setting consistent with the essential requirements for the ward's physical health and safety....").

**14.** *See* 39 Am.Jur.2d Guardian & Ward § 39 ("Best interests of ward or conservatee as paramount"); *cf. H.C.S.,* 42 P.3d at 1099 (noting analogy between analytical model in child custody cases, based on child's "best interests," and the similar aim in guardianship cases to "promote and protect the well-being of the person").

**15.** *Prost v. Schuffman,* 202 S.W.3d 41, 44 (Mo. App. E.D.2006) (internal quotation marks omitted).

**16.** The "good cause" standard invoked by the master's report may be a reference to the pre-2004 version of the conservatorship statute, which stated that the "court, for good cause, may pass over a person having priority and appoint a person having less priority or no priority." *See* H.C.S., 42 P.3d at 1097 (emphasis omitted) (quoting AS 13.26.210(b) (amended 2004)). The guardianship statute has never contained "good cause" language. But to the extent that the master applied a "good cause" standard in his analysis, the error was harmless. The master found that there was "good and overriding cause" to override the statutory priorities in order to serve Tammy's "important needs." This implies that the master found that it was in Tammy's "best interest" to override the statutory priority. AS 13.26.145(f).

son.[17] In accordance with the requirements of AS 13.26.145(f), the written findings explained why Tammy's best interests would be served by the appointment of a public guardian. The superior court carefully adhered to Alaska's statutes regarding guardianship.

Both the probate master and the superior court offer legally sufficient reasons why the appointment of a public guardian instead of Tammy's parents would have a greater chance of "encourag[ing] the development of maximum self-reliance and independence"[18] of Tammy. It is clear from the record as a whole that Tammy's parents have dedicated great efforts to raising Tammy and care for her deeply. But the probate master found, and the record sufficiently supports, that Theresa had a difficult work schedule on the North Slope, alternating between three weeks there and three weeks at home; that Jeff relied on others to drive Tammy from their home to needed medical and social services; and that despite her parents' efforts, Tammy did not receive at least some readily available services for vocational and life skills training. Based on these findings of fact, we conclude that it was not an abuse of discretion for the superior court to conclude that the appointment of a public guardian would be in Tammy's best interests. The superior court did not "consider[ ] improper factors, fail[ ] to consider statutorily mandated factors, or assign[ ] too much weight to some factors," despite the statutory priority list.[19]

Finally, Tammy's parents suggest that in light of precedent, reason, and policy, it would have been better to appoint a temporary public guardian "with the goal of educating the parents on the duties of a guardian . . ., and then allowing the parents to assume those duties in full." But it was not an abuse of discretion for the superior court to choose a different approach. The probate master's factual findings support the conclusion that the appointment of a public guardian would lessen the risk of Tammy not receiving important developmental services at this important stage in her life. In addition, training regarding guardianship would not necessarily address the problem of dissension in Tammy's family. Finally, it remains possible under the superior court's judgment that Tammy's parents might one day become Tammy's guardians. One of the public guardian roles is to "endeavor . . . to find a suitable private guardian or conservator for the public guardian's ward. . . ."[20] Tammy's parents remain free to petition the court in the future for a change in Tammy's guardianship.[21]

**B. The Superior Court Did Not Violate The 14th Amendment By Appointing The Public Guardian For Tammy Without Finding By Clear And Convincing Evidence That Tammy's Parents Were Unfit To Serve As Guardians.**

Tammy's parents contend that the superior court violated their substantive due process rights under the 14th Amendment by appointing the public guardian for Tammy without finding by clear and convincing evidence that they were unfit to serve as guardians. They note that in *Evans v. McTaggart*[22] we held that overcoming the parental preference for child custody constitutionally requires clear and convincing evidence that parental custody would be detrimental to the child, and contend that the parental right to substantive due process extends to the care of adult children who, because of developmental disabilities, remain dependent on their parents no less than minors. Thus, they argue that we should recognize that overcoming the parental priority in guardianship proceedings constitutionally requires clear and convincing evidence that the parents are unfit to serve as guardians, or that parental guardianship would be detrimental to the child.

As Tammy's parents implicitly concede in

---

**17.** AS 13.26.145(f).

**18.** AS 13.26.090.

**19.** *H.C.S.*, 42 P.3d at 1096 (citations omitted).

**20.** AS 13.26.380(b).

**21.** *See* AS 13.26.125.

**22.** 88 P.3d 1078 (Alaska 2004).

their brief,[23] the Alaska legislature has decided otherwise. The legislature established a guardianship appointment process for adults in general, with no separate track for developmentally disabled adults.[24] This process gives priority to parents over public guardians, but does not require any special evidentiary showing to overcome the priority if doing so is in the developmentally disabled adult's best interests.

■■■■ The Due Process Clause of the 14th Amendment includes a substantive component that protects "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition."[25] The United States Supreme Court has repeatedly "confirmed that our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education."[26] "Neither the Bill of Rights nor the specific practices of States at the time of the adoption of the Fourteenth Amendment marks the outer limits of the substantive sphere of liberty which the Fourteenth Amendment protects."[27]

■■■■ But the Court has also recognized that "[s]ubstantive due process has at times been a treacherous field" due to the "risks [that exist] when the judicial branch gives enhanced protection to certain substantive liberties without the guidance of the more specific provisions of the Bill of Rights."[28] "As the history of the *Lochner* era demonstrates, there is reason for concern lest the only limits to such judicial intervention become the predilections of those who happen at the time to be Members of this Court."[29] As a result, the Court has "always been reluctant to expand the concept of substantive due process...."[30] "By extending constitutional protection to an asserted right or liberty interest," a court "to a great extent, place[s] the matter outside the arena of public debate and legislative action."[31]

In *Troxel v. Granville*,[32] the Court's most recent exploration of the substantive due process rights of parents, the Court noted that "[t]he liberty interest ... of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized by this Court."[33] But at the same time, the Court has never taken a position on whether the substantive due process rights of parents extend to relationships with adult children.[34] A number of circuit courts have concluded that the Constitution does not protect a parent's relationship with an adult child "in the context of state action which has the incidental effect of severing that relationship."[35]

---

23. Tammy's parents concede that "both statutes give the appointing court discretion to override the statutory preferences."

24. *See* AS 13.26.090–.155.

25. *Washington v. Glucksberg*, 521 U.S. 702, 703, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citation omitted).

26. *Lawrence v. Texas*, 539 U.S. 558, 573–74, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (citation omitted).

27. *Planned Parenthood v. Casey*, 505 U.S. 833, 848, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (citation omitted).

28. *Moore v. City of E. Cleveland*, 431 U.S. 494, 502, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

29. *Id.* (citation omitted).

30. *Washington*, 521 U.S. at 720, 117 S.Ct. 2258 (quoting *Collins v. City of Harker Heights*, 503

U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)).

31. *Id.*

32. 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

33. *Id.* at 65, 120 S.Ct. 2054 (surveying over 75 years of case law, beginning with *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)).

34. *McCurdy v. Dodd*, 352 F.3d 820, 828 (3d Cir. 2003) ("[T]he Court's parental liberty cases have exclusively dealt with the right to make critical child-rearing decisions concerning the care, custody, and control of minors."); *see also id.* at 828 n. 5 (noting that "[o]n two occasions," in 1977 and 1981, "the Court granted review in cases where the issue might have arisen, but subsequently dismissed certiorari as improvidently granted.").

35. *Russ v. Watts*, 414 F.3d 783, 787 (7th Cir. 2005) (surveying cases).

But the factual and procedural surroundings of these cases are distant from those of the present case. They involved attempts by relatives to recover damages based on state action (such as a shooting by a police officer) that resulted in the death of a loved one.[36]

Tammy's parents raise a more challenging issue. They ask us to determine whether a parent has a constitutionally protected right to make decisions regarding the care, custody, and control of an adult child who, due to developmental disabilities, possesses the general competencies of a young minor.[37]

We are aware of only a single opinion, *Chambers v. School District of Philadelphia Board of Education*,[38] in which a court was confronted with the extension of a parent's substantive due process rights with regard to an adult, developmentally disabled offspring. But that case involved parents claiming that a school district's failure to provide their adult, developmentally disabled daughter with certain services had "deprived them 'of their daughter's companionship and association....'"[39] Because the parents' claim involved companionship and association-rather than a parent's right to make decisions about a child's upbringing without undue government interference—it raised a different and distinguishable issue. And, in any case, the Third Circuit disposed of the parents' due process claim in *Chambers* on other grounds.[40]

In an earlier case, *McCurdy v. Dodd*,[41] the Third Circuit foresaw the possibility of a case like *Chambers* and the difficulties it would pose.[42] In *McCurdy*, like *Chambers*, the court dealt with a parent's claim for recovery based on incidental state interference with the companionship and affection of an adult child. *McCurdy* explained why substantive due process protections do not extend to the relationship between a parent and an adult dependent child:

> [T]he parental liberty interest as defined by the Supreme Court ... concerns the right of parents to make critical child-rearing decisions concerning the care, custody, and control of minors. So defined, this fundamental right cannot exist indefinitely. By its very definition, it must cease to exist at the point at which a child begins to assume that critical decisionmaking responsibility for himself or herself.[43]

The Third Circuit then approvingly cited the District of Columbia Circuit:

> When children grow up, their dependence on their parents for guidance, socialization, and support gradually diminishes. At the same time, the strength and importance of the emotional bonds between them and their parents usually decrease. Concededly, the bond between a parent and child when the child is an adult usually bears some resemblance to the same bond when the child was a minor. But, as a long line of Supreme Court cases attests, the differences between the two stages of the relationship are sufficiently marked to warrant sharply different constitutional treatment.[44]

Most of the U.S. Supreme Court's parental rights jurisprudence has concentrated on the need to protect families from state interference in shaping their children, sometimes suggesting that it is important for families to transmit a heritage apart from the state's traditions. For example, in *Meyer v. Nebraska*[45] the Court notes "the power of par-

**36.** *See id.* at 787–88.

**37.** As noted above, it is uncontested that Tammy functions at the level of an eight- or nine-year-old.

**38.** 587 F.3d 176 (3d Cir.2009).

**39.** *Id.* at 190.

**40.** *Id.* at 192 (concluding that the parents' claim failed because they did not allege that the state deliberately sought to interfere in the parent-child relationship).

**41.** 352 F.3d 820 (3d Cir.2003).

**42.** *Id.* at 830 n. 8.

**43.** *Id.* at 829 (internal citations omitted).

**44.** *Id.* (citing *Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C.Cir.2001)).

**45.** 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

ents to control the education of their own." [46] In *Pierce v. Society of Sisters*,[47] the Court spoke of "the liberty of parents and guardians to direct the upbringing and education of children under their control." [48] The Court explained that the Constitution's "fundamental theory of liberty ... excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state." [49] While these principles remain relevant in the case of a developmentally disabled child, they may carry less weight after the developmentally disabled child has been exposed to her parent's formative influences for 18 years. It is inappropriate to refer to care for a developmentally disabled adult offspring as a form of "child rearing." [50] The risk to the passing on of a family's heritage also seems substantially less when the state interferes in the care and custody of an adult developmentally disabled child than when the state interferes in decisions about the upbringing of a non-disabled minor.

But there is a far more significant factor we weigh against extending substantive due process protection to parents' care for a developmentally disabled adult child: the interests of the developmentally disabled adult herself. Even in the context of minor children, when a child's preferences and interests conflict with the choices of parents, protection of the parents' rights may come at the expense of the rights of the child. In *Wisconsin v. Yoder*,[51] the Court protected

the rights of parents to direct the education of their children against a compulsory education law, but made clear that its analysis might not apply in a case "in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred." [52] An even stronger case can be made that the fundamental liberty interests of developmentally disabled adults "must ... be balanced in the equation." [53] The general trend over the previous decades has been to recognize that developmentally disabled individuals "are not, and should not be, viewed or treated as 'eternal children.' " [54] This trend is reflected in the Americans with Disabilities Act, which states that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency...." [55] The present case illustrates the essential tension between protecting the parental interest in maintaining control over the care and custody of an adult developmentally disabled child, and that child's interest in maximal participation in society and the development of maximum self-sufficiency. The probate master and the superior court concluded that appointing Tammy's parents as her guardians could limit her potential by constraining her access to life skills training and to her extended family. We cannot conclude that the United States Constitution requires us to overturn the Alaska Legislature's decision to value Tammy's interest in obtaining the

---

**46.** *Id.* at 401, 43 S.Ct. 625.

**47.** 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

**48.** *Id.* at 534–35, 45 S.Ct. 571.

**49.** *Id.* at 535, 45 S.Ct. 571. For a further summary of Supreme Court case law on the fundamental liberties of parents to direct the upbringing of their children, see *Troxel v. Granville*, 530 U.S. 57, 65–66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

**50.** *Cf. Moore v. City of E. Cleveland*, 431 U.S. 494, 505, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (citing cases recognizing that "[d]ecisions concerning child rearing ... [are] entitled to constitutional protection").

**51.** 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

**52.** *Id.* at 230, 92 S.Ct. 1526 (citation omitted).

**53.** *Troxel*, 530 U.S. at 88, 120 S.Ct. 2054 (Stevens, J., dissenting).

**54.** Melinda Hunsaker, *Limited Conservatorships: A Delicate Balance*, 50 ORANGE COUNTY LAW. 26, 26 (2008). "A delicate balance must be struck between respecting the developmentally disabled individual's adult status, and the implicit legal rights granted by that status, with the parents' interest and understandable desire to continue to protect and assist their developmentally disabled child." *Id.*

**55.** Americans with Disabilities Act of 1990, 42 U.S.C. § 12101(7) (1990).

**816**

greatest possible self-sufficiency and independence above her parents' interests.

We therefore affirm the superior court and decline to hold that parents have a substantive due process right to make decisions regarding the care and custody of their adult developmentally disabled child unless shown to be unfit by clear and convincing evidence. This conclusion is consistent with the states's traditional involvement in the care and maintenance of the developmentally disabled.[56] The Constitution requires the state to determine guardianship for any adult based on the adult's best interests, nothing more. Given the difficult balance between the interests of parents, their developmentally disabled adult offspring, and the state, and the lack of any clear violation of a fundamental liberty interest in the present case, we see no reason to upset the careful balance struck by the Alaska Legislature.

## V. CONCLUSION

Because the superior court did not abuse its discretion in its application of AS 13.26.145, including its overriding of the parental priority for guardianship based on the best interests of the ward, and because the superior court's action did not violate Tammy's parents' substantive due process rights under the 14th Amendment, we AFFIRM the decision of the superior court.

---

**56.** The law of guardianships has been traced back to the English feudal system. *See* Joan L. O'Sullivan, *Role of the Attorney for the Alleged Incapacitated Person*, 31 STETSON L. REV. 687, 689–92 (2002) (recounting history of guardianship). Traditionally the King of England had jurisdiction over mentally disabled individuals, arising from his *parens patriae* authority. *Id.* at

169. After the American Revolution, "the care and custody of persons of unsound mind, and the possession and control of their estates … were deemed to be vested in the people…." *Bliss v. Bliss*, 133 Md. 61, 104 A. 467, 471 (1918) Case law reflects that courts of equity exercised "full and complete jurisdiction over the persons and property of [the mentally disabled]." *Id.*