*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| EDNA L., | ) |
| | ) |
| Appellant, | ) Supreme Court Nos. S-17485/17505 |
| | ) (Consolidated) |
| | ) |
| v. | ) Superior Court Nos. 3PA-18-00059/ |
| | ) 3PA-18-00089 CN |
| STATE OF ALASKA, | ) |
| DEPARTMENT OF HEALTH & | ) O P I N I O N |
| SOCIAL SERVICES, OFFICE OF | ) |
| CHILDREN'S SERVICES, | ) No. 7496 – December 24, 2020 |
| | ) |
| Appellee. | ) |
| | ) |
| —————————————— | ) |
| | ) |
| JOHN L., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE OF ALASKA, | ) |
| DEPARTMENT OF HEALTH & | ) |
| SOCIAL SERVICES, OFFICE OF | ) |
| CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| —————————————— | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Vanessa White, Judge.

Appearances: Michael Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, for Appellant Edna L.

J. Adam Bartlett, Anchorage, for Appellant John L. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

MAASSEN, Justice.
STOWERS, Justice, with whom CARNEY, Justice, joins, concurring.

## I. INTRODUCTION

A mother and father appeal the termination of their parental rights after proceedings in the Palmer Families with Infants and Toddlers Court (FIT Court). They argue that their rights were violated when the FIT Court's "rigid, non-fact driven," 12-month timeline governed the progression of the Child in Need of Aid (CINA) cases of their two children. We conclude that it was error to adhere to the FIT Court's preset timeline rather than making an individualized assessment of whether the parents had a reasonable time to remedy based on the facts of their children's cases, as required by statute. We further conclude that the parents did not knowingly and voluntarily waive that statutory requirement.

## II. FACTS AND PROCEEDINGS

Edna and John L.[1] are married and have a daughter, Ann; Edna also had a son, Chris, from a previous marriage to Charles F.[2] In early March 2018 the Office of Children's Services (OCS) took custody of six-year-old Chris after Edna and John were

---

[1] We use pseudonyms to protect the parties' privacy.

[2] Charles agreed to relinquish his parental rights to Chris if Edna's rights were terminated so that Chris could be adopted by the foster parents. He did not participate in this appeal.

seen using drugs in Chris's presence. In late April OCS took custody of Ann shortly after her birth. Both children tested positive for drug exposure, and Chris was behind in school and in need of significant dental work. The children were placed with a foster family.

Edna and John had long struggled with substance abuse, and both received behavioral health assessments that recommended intensive outpatient or residential treatment. Early in their children's CINA cases both parents failed to follow through with their OCS case plans and continued using drugs. They missed scheduled urinalysis appointments, court hearings, and family team meetings.

## A.    The FIT Court Overview

The FIT Court is a therapeutic court in Palmer. Based on similar courts in other jurisdictions, its stated "primary goals are to achieve permanency within twelve months and to reunify young children with their families of origin." Families in pending CINA cases involving children under three years old are eligible to participate.

The FIT Court team consists of the FIT Court judge and project coordinator, "ICWA specialist,"[3] and representatives of various State entities: OCS, the Department of Law, the Public Defender Agency, and the Office of Public Advocacy. When an eligible family expresses interest in the court, the FIT Court team votes on whether to accept the case; the judge makes the final decision. Cases accepted into the FIT Court are assigned to the FIT Court judge.

Families are allowed to leave FIT Court until there is an adjudication that the child is in need of aid; at that point "the participants will no longer have the ability to opt-out of the therapeutic court." To ensure they understand this and other unique

---

[3]    The Indian Child Welfare Act (ICWA) specialist is not further identified in our record.

aspects of FIT Court, participants are given an opt-in form to sign, acknowledging that they "understand and agree to the program requirements." The form requires participants to initial a set of statements acknowledging that they "understand the goal of FIT Court is for the minor(s) to reach permanency in 12 months. Permanency means case closure through reunification, adoption, or guardianship"; they "understand FIT Court has an alternative hearing schedule, which includes monthly court hearings and a permanency hearing at 6 months"; and they "understand that [their] case will not return to regular Child in Need of Aid (CINA) proceedings. It is not possible to opt-out post adjudication. This is different from other therapeutic courts."

Having committed to this expedited process, FIT Court participants receive increased attention from caseworkers. An assigned team works to support the parents in getting the help and services they need. FIT Court participants work through four phases: (1) "Evaluation of Needs," which takes "approximately three months" and in which "the participant's goal is to engage in services" such as parenting classes, substance abuse assessments, urinalyses, visitation, and therapy; (2) "Putting Plans into Action," "an ongoing phase where the participant is learning and problem solving, building on family strengths, and fully engaged in services"; (3) "Stability," in which the participants are finishing classes, are "fully engaged in services," and, if reunification is still an option, are "ready for reunification"; and (4) "Graduation," at which point "permanency has been achieved and there is no further need for the Court's intervention."

### B.    Proceedings

#### 1.    Ann's probable cause hearing

The superior court held an emergency probable cause hearing for Ann on

May 3, 2018.[4]  The court asked Edna and John to consider participating in FIT Court, explaining the court's "two-fold" mission:

> First to serve families with infants and toddlers with much more significant wraparound services for the entire family.  So, in your circumstance, given the allegations in the petition, that might include substance abuse treatment, it might include mental health treatment.  It almost always includes what we call child-parent psychotherapy . . . .
>
> [The FIT Court] is a court where we're also trying to make sure that these babies achieve permanency within a year's time. . . . [O]ne of the primary goals of this program is to promote permanency within one year's time.
>
> And secondarily, the reason for all of these wraparound services is to promote reunification of the child with the parents whenever that can be done safely.  So, the focus is on getting the case resolved within a year.  And whenever possible, having that . . . resolution be reunification of the child with the family.

The probable cause hearing was continued, and a week later both Edna and John indicated their interest in FIT Court.  The court informed them that they would be the seventh family to participate and explained that they would have to work hard on their case plans, be honest, and ask for help when they needed it.  In return, the court told them, the FIT Court team would work hard for them and "lift [them] up":

> As long as you do your part, I promise you, the team will do their part.  And they will be honest with you at all times.  This is a tough program, too, because there's no time to waste.  If you're admitted into the FIT Court, you have to hit the ground running in terms of working the items on your case plan, because we're going to get [Ann] to permanency

_____

[4]    *See* AS 47.10.142(a), (d), (e) (governing emergency custody and temporary placement hearings at which court determines "whether probable cause exists for believing the child to be a child in need of aid").

with you or without [you] within 12 months of the date she was removed. So, there is no time to waste.

### 2. The FIT Court opt-in in Ann's case

The court had an official FIT Court opt-in hearing for Ann's case on May 22, 2018. The court walked through all the items on the "FIT Court opt-in checklist" before making a finding that both of Ann's parents, Edna and John, were "entering into the FIT Court freely, voluntarily, and intelligently, both with the advice of competent counsel." The court explained that "some determinations about permanency" would be made "in about six months' time": "At the six-month mark, if you're not in a home visit or close to a home visit, then the case may convert from one where we're focusing on reunification to where we're focusing on adoption for [Ann]." The court reiterated that "our goal is permanency in 12 months," emphasizing the FIT Court's higher-than-traditional success rate: "and by success I mean reunification and no repeat maltreatment."

Edna's attorney informed the court, "[Edna] knows what she's getting into, and we had a long meeting with the parents last week and discussed some serious expectations of this family. And I think that they are committed to that."

### 3. Ann's adjudication as a child in need of aid and the FIT Court opt-in in Chris's case

Ann's adjudication as a child in need of aid occurred on July 13, 2018.[5] Both Edna and John stipulated through their attorneys — and the court subsequently found — that Ann was a child in need of aid under AS 47.10.011(10) because of parental substance abuse.[6] Edna's attorney informed the court that Edna intended "to stipulate

---

[5] *See* AS 47.10.080(a)-(f) (describing process and effects of adjudication).

[6] *See* AS 47.10.011(10) (providing that court may find child to be child in (continued...)

to adjudication and disposition without admission under subsection ten." The attorney explained, "She understands this is her fish-or-cut-bait moment that she is intending to stay in the FIT Court and work the program."

The court turned to John, whose counsel was not present at the hearing, and asked whether he had also "had a chance to talk to [his attorney] about the fish-or-cut-bait part of . . . adjudication." John responded, "Yes." The court continued:

> I'm going to spend just a minute making sure that we have a good record and you understand. . . . [I]f you weren't in FIT Court, you would have the right to a hearing [on adjudication]. At that hearing, [OCS] would present evidence, and I would make a determination after the evidence was presented and you had a chance to cross-examine the witnesses as to whether or not it was more likely than not that [Ann] was a child in need of aid under the substance abuse section of the Child in Need of Aid statute.
>
> . . .
>
> [T]he next step if I make that finding is, well, what are we going to do about that? And the what-are-we-going-to-do-about-it part is called disposition. And in a traditional case, I would more likely than not enter an order giving [OCS] custody of [Ann] for a period of up to two years. In FIT Court, I give a disposition order that gives [OCS] custody for a period of up to one year.
>
> That doesn't mean [OCS] has to have custody for a whole year, but it means that we don't have to address that issue again for a year as you're working your case plan and working toward reunification. As [Edna's counsel] said, this is also the fish-and-cut-bait moment for FIT Court, because

---

**6** (...continued)
need of aid on ground that "the parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child").

if you agree to adjudication and disposition today, then you're in FIT Court until the case is closed. You can't say, "I've changed my mind, I want to go back to a traditional court hearing[.]". . . [Y]ou're with me doing it on this shortened timeline with the enhanced services until the case is closed. Do you both understand?

John and Edna both said they understood.

The court then proceeded to discuss opt-in for the case of Edna's son Chris, who had earlier been adjudicated a child in need of aid. Although FIT Court is primarily for younger children, the team allowed Chris's case to proceed in FIT Court so that the CINA cases for Edna's two children could follow the same timeline and access the same resources.

When explaining the FIT Court to Chris's father Charles, who was participating by phone, the court said, "The benefit to [Chris] is that [he] will get to permanency sooner than he would. Whether permanency is reunification with mom, reunification with you, or some other permanent arrangement, he's going to get to permanency sooner in this court." At a subsequent hearing, the court explained:

So, I'll enter — [Charles,] this is all legal mumbo jumbo. What it means is . . . that you guys are in the program, you're stuck with me until we're done. And today I'm entering what we call disposition orders, and that just means that the Office of Children's Services will be granted custody of [Chris and Ann] for a period not to exceed one year. . . . The one year is just sort of a benchmark, and we're going to continue to work through the case. The goal is to try and have these kids' cases completely resolved within that year. But it's . . . a legal formality that I have to enter . . . that order for disposition. Is that clear?

Charles answered, "Yes."

When obtaining Edna's consent to hearing Chris's case in FIT Court, the court did not go through all the questions on the opt-in form or confirm Edna's

understanding of them, reasoning, "[B]ecause [Edna's] already done an opt-in hearing with me for [Ann's case], I'm very comfortable just having that opt-in form filled." The court entered disposition orders for both children committing them to OCS's custody for a period not to exceed one year.

### 4. Permanency hearing

A November 2, 2018 status hearing was also a permanency hearing for both children.[7] The court re-emphasized the FIT Court's goal of reunification: "We're going to keep doing exactly what we've been doing and that is trying to achieve reunification within this year or so of time. Do you understand?" The court commended Edna for being sober, undergoing detox, and getting into a residential treatment program.

Notwithstanding this recognized progress, OCS served petitions for termination of parental rights on the parties at the hearing. OCS's attorney explained that although Edna had "made some brief progress, . . . at this time the goal is adoption. We'll still continue to work reunification but the primary goal is adoption." The court explained these developments to the parents:

> Okay. So, what that means is that there's still two goals, right? Adoption and reunification. But because of the amount of time that has passed since [Ann and Chris] came into foster care, [OCS] at this point needs to be addressing the possibility that these children will be freed for adoption.
>
> It does not mean that reunification is not possible. . . . [W]hat it does mean is if reunification is going to be a viable possibility, everybody needs to be clicking on all cylinders from here on out. Everybody on the same page about that?

---

[7] "The purpose of the permanency hearing is to establish a permanency plan for each child committed to state custody . . . and to ensure that findings with respect to the plan are made as required by state and federal laws." CINA Rule 17.2(a).

The court determined that both adoption and reunification were appropriate goals: OCS "continued to make appropriate efforts to promote reunification and to finalize the permanency plan," but, while "recognizing the progress that each parent is making," "it would be contrary to both children's best interests to return them to the care or custody of any of their parents." The court stated that the next hearing would be a pretrial conference. At a December 6 hearing the court decided that the termination trial, originally slated for February, would be held in March to accommodate scheduling conflicts.

### 5. Motion to continue the termination trial

Edna moved to continue the termination trial, citing the progress that both she and John were making in their substance abuse treatment programs. At a hearing on February 28, 2019, OCS opposed the continuance, arguing that accepting "a wait-and-see" approach and hoping that "more time will provide more information" would "eviscerate the FIT Court and the expedited permanency timeline that parents knowingly and voluntarily chose to engage in, in exchange for the enhanced services and efforts to get the children into permanency." OCS's counsel pointed out that the case had been pending in FIT Court for "nine months at least, . . . maybe ten if you include the time before [opt-in,] and that is within the norm in terms of . . . the timing of termination petitions."

Edna's attorney protested that the 12-months-to-permanency goal was being treated as a deadline divorced from the facts of the case:

> I do believe that good cause exists [to continue the trial]. And I think that if everybody in this room were honest with themselves, they would recognize and admit that this case would not be heading to a termination trial with a mother who's four or five months sober but for the timeline — the artificially imposed timeline of FIT Court.

The court replied that the deadline "is not . . . artificial, it is not arbitrary," but rather "is based on social science about what kids need." The court expressed its frustration that this was the third or fourth FIT Court case in which parents' attorneys had requested continuances based on the argument that FIT Court imposed "an arbitrary deadline." The court explained that termination was not "a fait accompli" simply because the petition had been filed and that trial could still result in a finding that the grounds for termination had not been satisfied.

Edna's lawyer argued, however, that the ramifications of the 12-month timeline were "not clearly . . . explained to the parent at the outset." She contended that none of the FIT Court milestones in Edna's case — "a termination petition at the five-month mark" and "proceed[ing] to trial at the 10-month mark . . . in the hopes that we'll achieve an adoption by the 12-month mark" — were "based on the facts of [Edna's] case whatsoever." She reiterated that if Edna "were in regular court, she would be entitled to more time."

The court agreed: "She would — whether she was entitled to it or not, she would get more time 99 percent of the time. . . . But she opted to do this instead." The court observed that other parents who would be granted a continuance under these circumstances "didn't opt into this court recognizing that the goal is permanency within 12 months." The court noted that Chris had been in OCS custody for about a year already, and "when we get to trial, [Ann] will be at 10 and a half months," which is "within the timeframes for the FIT Court." The court continued: "[Edna] opted into a therapeutic court with a 12-month-to-permanency timeline. She didn't opt into wellness court. . . . She opted into this model. And these kids have a right to permanency." Denying the motion to continue trial, the court repeated its "tremendous frustration . . . with this argument that [Edna] didn't sign on for what she signed on for, for these kids

and to achieve permanency. . . . [I]t's disingenuous to argue that she didn't know that she would be going to trial about now."

### 6. Termination trial

A termination trial was held over nine days in March 2019. John, participating telephonically from prison, testified that he was taking a residential substance abuse treatment program, an anger management class, and a parenting class; was being treated for mental illness; and was scheduled to be out on parole "in about a year." He testified that he was "disgusted" with his addiction and what it had done to his family and was committed to improving himself for his family's sake going forward. As for Edna, at the time of trial she was 145 days sober and making progress in inpatient treatment. Her primary therapist at the treatment facility testified that Edna had made "enormous" change.

At the close of trial the court entered both oral and written findings terminating Edna's and John's parental rights. The court found by clear and convincing evidence that Edna had subjected Ann to the conditions described in AS 47.10.011(10) (parental substance abuse), and that John had subjected Ann to the conditions described in subsections (2) (incarcerated parent's failure to adequately arrange for child's care) and (10). The court found by clear and convincing evidence that Edna had subjected Chris to the conditions described in subsections (9) (neglect) and (10). The court also found by clear and convincing evidence that Edna and John failed "within a reasonable time" to remedy the conduct that rendered Chris and Ann children in need of aid. The court explained that "if you were going to grade [Edna] on a curve for her participation in family contact, she'd get at least a B. She really tried most of the time to engage in family contact with both of the children," but her efforts were ultimately insufficient:

> [Edna] has yet to accomplish multiple foundational treatment
> objectives necessary to build a foundation for a meaningful

recovery much less build a health[y] relationship with [Ann or Chris]. [John] has not remedied the conduct or conditions that brought [Ann] into care and upon release from incarceration would need to demonstrate his ability to be a sober and appropriate caregiver along [with completing] case plan activities that cannot be completed in custody.

The court also found that OCS had made reasonable efforts towards reunification and that termination was in the children's best interests. Edna and John appeal.

## III. STANDARDS OF REVIEW

We review questions of statutory interpretation de novo.[8] When reviewing a trial court's decision that a litigant has waived a right, we review the court's fact-finding for clear error, but we review de novo its decision that those facts satisfy the relevant legal standard.[9]

## IV. DISCUSSION

### A. Unless The FIT Court's Timeline Has The Flexibility To Account For Individual Circumstances, It Violates The Statutory Requirement That Parents Have A Reasonable Time To Remedy.

Alaska Statute 47.10.088(a)(2)(B) provides that a court may not terminate

---

[8] *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1118 (Alaska 2009).

[9] *See Hutton v. State*, 350 P.3d 793, 796-98 (Alaska 2015) (applying "mixed question of law and fact standard of review" to whether defendant made constitutionally valid waiver of right to jury trial, with superior court's underlying factual findings reviewed for clear error and "the ultimate conclusion drawn from those facts — whether a defendant's waiver is constitutionally sufficient" — reviewed de novo); *see also Hudson v. Citibank (S.D.) NA*, 387 P.3d 42, 45-46 (Alaska 2016) (observing that "it is clear that the majority of jurisdictions treat arbitration waiver as a mixed question of law and fact"); *Forster v. State*, 236 P.3d 1157, 1161-62 (Alaska App. 2010) ("We must uphold the trial court's factual findings unless they are clearly erroneous, but we independently determine whether [a *Miranda*] waiver was knowing and intelligent, viewing the facts in the light most favorable to the judge's ruling.").

parental rights and responsibilities absent clear and convincing evidence that the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury." A court making this determination

> may consider any fact relating to the best interests of the child, including
>
> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age and needs;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3) the harm caused to the child;
>
> (4) the likelihood that the harmful conduct will continue; and
>
> (5) the history of conduct by or conditions created by the parent.[10]

"Any fact relating to the child's best interests is relevant to the determination."[11] Although the focus is on the children's needs, the parents' efforts — and any progress they have made to ensure that "the harmful conduct will [not] continue" — are among the statutory factors relevant to determining whether and how the children's needs will be met.[12]

In *Christina J. v. State, Department of Health & Social Services, Office of Children's Services*, a termination trial took place 13 months after the child was removed

---

[10] AS 47.10.088(b).

[11] *Trevor M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 368 P.3d 607, 612 (Alaska 2016).

[12] AS 47.10.088(b)(2), (4); *see, e.g.*, *Trevor M.*, 368 P.3d at 612 (discussing father's "minimal" "efforts to remedy his conduct" in relation to child's best interests).

from the mother's custody.[13] Alaska Statute 47.10.088(d) mandates that OCS petition for termination when "the child has been in foster care for at least 15 of the most recent 22 months," and the mother argued that the statute "soundly suggests that 22 months is a reasonable time period during which both the 'efforts' required and the decision regarding the initiation of a termination can be made."[14] We rejected the argument that the statute set "a minimum time OCS must wait before filing."[15] Instead, OCS was required to determine "when to file a petition based exclusively on the best interests of the child."[16] We clarified that "reasonable time" is defined by statute "*not as a specific number of months* or by reference to parents' needs, but as 'a period of time that serves the best interests of the child, taking in[to] account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments.' "[17] We highlighted the factual context of the superior court's decision that 13 months was a reasonable time to remedy, including not just the child's need for permanency but also the mother's "failure to make any real progress toward" completing treatment, which "indicated that there was a very low likelihood of returning [the child] to her care within a reasonable time based on his age and needs — a permitted consideration under AS 47.10.088(b)."[18] Emphasizing again that "reasonable time" was centered on the child's needs, we concluded: "We do not suggest that 13 months is an objectively

---

[13] 254 P.3d 1095, 1106 (Alaska 2011).

[14] *Id.* (quoting appellant's brief).

[15] *Id.*

[16] *Id.* at 1106-07.

[17] *Id.* at 1107 (emphasis added) (quoting AS 47.10.990(28)).

[18] *Id.*

'reasonable time' for parents to remedy their conduct; as reflected in our past CINA decisions, *this determination must be made on a case-by-case basis and the amount of time considered 'reasonable' will vary.*"[19]

In this case, the absence of a case-by-case determination of a reasonable time to remedy clearly worked to the parents' disadvantage. When denying Edna's motion to continue trial, the superior court acknowledged that she would have had more time to work on remedying her conduct had she not been in FIT Court. The court's findings following trial made clear that its termination decision was based on Edna's failure to remedy within the 12-month timeline: "[Y]ou cannot waive the right to have a longer period of time to engage in your recovery and then argue that the lack of more time to engage in your recovery is a violation of your rights to due process or equal protection." The court acknowledged that a few more months may have made a difference for Edna, observing that if she had started her residential treatment immediately after her first substance abuse assessment in June 2018, rather than waiting until the end of October, "there would have been the potential to begin a family home visit as soon as December or January." But the court affirmed its view that the case was governed by the 12-months-to-permanency timeline regardless of what might have happened without it: "Unfortunately, she wasn't able to [remedy her conduct] in a timely fashion even though she recognized that the timelines in FIT Court are there to promote permanency for the child in a relatively brief period of time."

When implementing court-created rules in the CINA context, we must be careful not to infringe on the legislative balancing of policy and process. In *Jennifer L.*

---

[19] *Id.* at 1108 (emphasis added); *see also Trevor M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 368 P.3d 607, 612 (Alaska 2016) (reiterating *Christina J.*'s holding that the reasonable time determination must be made on a case-by-case basis).

-16-                                                                                    7496

*v. State, Department of Health & Social Services, Office of Children's Services*, we addressed a provision of the CINA rules allowing the superior court to delegate to a master the task of holding a temporary custody hearing and determining whether a child should be immediately returned home.[20] The rule incidentally added a layer of judicial review and ensuing delay that we held was contrary to the "especially expeditious process" contemplated by the CINA statutes.[21] Recognizing "that procedural rules can affect substantive rights," we noted also that "[c]hildren's welfare and the parent-child relationship are particularly infused with concerns of public policy" and thus fell within the legislature's authority to create substantive law.[22] We cautioned that the courts should "be especially attentive to the effects of procedural rulemaking" in CINA cases.[23]

The CINA statutes and our case law make clear that a reasonable time to remedy, "made on a case-by-case basis," is critical to the protection of the parents' fundamental interest in the custody and care of their children.[24] To the extent the 12-months-to-permanency timeline is interpreted as lacking the flexibility to account for individual circumstances, it contravenes the statutory command of AS 47.10.088(b). It was error for the court to hold that the FIT Court timeline was determinative of whether the parents had a reasonable time to remedy.

---

[20] 357 P.3d 110 (Alaska 2015).

[21] *Id.* at 116.

[22] *Id.* at 117.

[23] *Id.*

[24] *Id.*

**B.** **The Parents Did Not Knowingly And Voluntarily Waive The Statutory Requirement Of A Timeline Tailored To Their Individual Circumstances.**

Parties to CINA proceedings may waive certain rights, even those with constitutional underpinnings.[25] Any such waiver, however, "must be knowing and voluntary."[26] The superior court determined that parents who opt into FIT Court "waive the right to have a longer period of time to engage in [their] recovery." Edna and John argue, however, that they never intended to give up the right to a fact-based determination of whether they had had a reasonable time to remedy.

The superior court determined that Edna and John opted into FIT Court voluntarily and that the opt-in process was sufficient to ensure that they understood the consequences of the 12-month commitment. At the hearing on Ann's adjudication, when the parents also stipulated to disposition, the court addressed both parents directly. The court reminded them that by agreeing "to adjudication and disposition today, [they would

---

[25] *Norman S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 459 P.3d 464, 466 (Alaska 2020) ("By consenting to certain procedures or by failing to object to others, a party may waive those rights which are arguably encompassed within due process guarantees." (quoting *In re C.L.T.*, 597 P.2d 518, 522 (Alaska 1979))); *Matthew H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 397 P.3d 279, 283-84 (Alaska 2017) (discussing parent's right to waive counsel pursuant to Alaska CINA Rule 12(c)); *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1118-19 (Alaska 2010) (concluding that issue of expert qualification in ICWA termination proceeding was waived by failure to object at trial).

[26] *Schacht v. Kunimune*, 440 P.3d 149, 157 (Alaska 2019) (quoting *Deptula v. Simpson*, 164 P.3d 640, 644 (Alaska 2007)) (holding that waiver of statutory rights must be knowing and voluntary); *Brandner v. Providence Health & Servs.–Wash.*, 394 P.3d 581, 588 (Alaska 2017) ("We previously have held that a waiver of constitutional rights must be knowing and voluntary, and even in civil cases 'courts must indulge every reasonable presumption against their waiver.'" (quoting *Lynden Transp. v. State*, 532 P.2d 700, 717 (Alaska 1975))).

be] in FIT Court until the case [was] closed," and they could not later "say I've changed my mind, [and] I want to go back to a traditional court hearing." The court asked the parents whether they understood; both responded, "Yes, ma'am," and the court accepted their stipulations for adjudication and disposition. The court found that both Edna and John "entered into this stipulation freely, voluntarily, and intelligently . . . with the advice of competent counsel."

Eight months later, when Edna's attorney argued for a continuance of the termination trial on the basis of Edna's progress in recovery, the court agreed with her point that other parents in her situation would receive more time to remedy "99 percent of the time"; the court observed, however, that those other parents "didn't opt into this court recognizing that the goal is permanency within 12 months." When Edna argued that she had not understood the rigidity of the deadline, the court called her argument "just disingenuous."

The superior court's oral findings at the close of trial reiterated that Edna had opted into FIT Court voluntarily, understanding the rules. The court noted that Edna's attorney "went through every single line item of that waiver form, that opt-in form with her. She understood every single one of them." In its subsequent written order the court repeated that "[Edna] made the decision to opt-in knowing what the rules and expectations were as her attorney reviewed the opt-in form with her."

Edna argues, however, that she did not fully comprehend what she was agreeing to.[27] In her trial testimony she denied that she understood the FIT Court rule to be "a hard and fast 12-month-you-would-be-terminated rule." Our review of the record confirms that the parents were given, at best, mixed messages as to whether

---

[27]    John does not explicitly argue a lack of adequate notice, but his argument implies that neither parent intended, by opting into FIT Court, to give up "their right to have a reasonable amount of time to remedy their conduct."

12-months-to-permanency was an aspirational goal or an inflexible deadline. In its explanations of FIT Court the court repeatedly emphasized the parents' need to work fast because of the expedited timeline, warning, "[W]e're going to get [Ann] to permanency with you or without [you] within 12 months of the date she was removed." At the same time, however, the court consistently characterized 12-months-to-permanency as a *goal*: "[O]ne of the primary goals of this program is to promote permanency within one year's time." "[O]ur goal is permanency in 12 months. . . . [T]he primary goal of the program is permanency for these kids in 12 months." At the opt-in hearing for Chris's case, the court explained, "The one year is just sort of a benchmark, and we're going to continue to work through the case. The goal is to try and have these kids' cases completely resolved within that year."

The opt-in forms signed by the parents, and gone over with them orally at the opt-in hearings, used the same terminology: "I understand the goal of FIT Court is for the minor(s) to reach permanency in 12 months." The program manual is even broader in its characterization of the timeline:

> The goal [of FIT Court] is to successfully complete the program between six and twelve months. Each participant and case is different, and healing the relationship between participants and their child(ren) is an ongoing process which cannot be confined to any specific time frame. The goal of the Palmer FIT Court is to reach permanency within twelve months.[28]

---

[28] There is no indication in the record that the parents read the FIT Court policy and procedures manual. The manual states, however, that it "provides the team with detailed information about the practices and expectations of the Palmer FIT Court" and "guides the Palmer FIT Court Team as well as others involved with the court." It further provides that "[t]he participant's attorney is responsible for explaining the program requirements to the participant." We assume that the language used in the

(continued...)

Edna's lawyer relied on the word "goal" when arguing for a continuance of the termination trial: "[T]he fact that we . . . call it a goal means it's aspirational. It does not mean you will be bound by a 12-month timeline." The lawyer's understanding of "goal" is consistent with the word's ordinary usage.[29]

A second troubling aspect of the 12–months-to-permanency goal is how it was defined: emphasizing reunification to the virtual exclusion of the serious alternative, the expedited termination of parental rights. We recognize that therapeutic courts are intended to provide settings in which participants are coached, encouraged, and praised for their progress. We do not intend to minimize the importance of an atmosphere of optimism and support. At the same time, however, when parents are giving up an important right it is critical that they understand the consequences, particularly the likelihood of an adverse outcome. For parents most likely to benefit from the kind of services FIT Court advertises — parents like Edna and John with long-term substance abuse problems, for example — FIT Court may well mean a fast track to termination, because what the parents can accomplish in less than a year will not be enough to offset a history of relapse and recovery.[30] We are not persuaded that Edna and John were

---

[28]     (...continued)
manual is intended to shape how attorneys explain the program to their clients.

[29]     *See Goal*, THE RANDOM HOUSE COLLEGE DICTIONARY (rev. ed. 1988) ("the result or achievement toward which effort is directed; aim; end"); *Goal*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2020) ("The object toward which an endeavor is directed; an end").

[30]     *See, e.g.*, *Christopher C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 465, 475-76 (Alaska 2013) (affirming finding that mother had failed to remedy in reasonable time despite "her more than eight months of sobriety (including her four months in residential treatment)" and other positive changes in her life); *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*,
(continued...)

adequately informed, before opting into FIT Court, that a likely consequence was the loss of their parental rights in less time than they would have outside of FIT Court.

We note that the superior court never used the word "termination" when describing the FIT Court program to the parents, and the word does not appear in any of the program's written materials. The FIT Court brochure says that the program's "primary goals are to achieve permanency within twelve months and to reunify young children with their families of origin."[31] The written description of FIT Court's four phases states, for Stage 3, that "[i]f you have not completed enough of your case plan to begin to talk about reunification, the court team will shift focus to an alternative plan for the permanency of your child(ren)," but it does not say what that alternative plan might be. The only resolution described in the phases is "graduation" at Stage 4, when the participant demonstrates her "plan to be self-sufficien[t] and to be able to meet the needs of [her] family." The policy and procedures manual, at the end of the "Court Meetings and Hearings" section, describes only "the reunification ceremony" that "recognizes the parents' commitment to family preservation and to providing a safe, nurturing home for their children." The opt-in form, which the court read through with the parents and on

---

[30] (...continued)
74 P.3d 896, 902-03 (Alaska 2003) (affirming finding that mother had not remedied her conduct within reasonable time despite one year's sobriety before trial, as sobriety was "a relatively new phenomenon in her life" after she had "struggled with substance abuse and relapsed after treatment a number of times"). In this case, even if Edna — while pregnant with Ann — had become sober the day OCS took custody of Chris, she would only have been sober for 12 months at trial. Given her long history of substance abuse and the still-relatively-high risk of relapse, the superior court may still have determined that she had not remedied the harmful conduct within a reasonable time. The court recognized that the parents would struggle and have some setbacks while working toward sobriety.

[31] ALASKA COURT SYSTEM, PALMER FAMILIES WITH INFANTS AND TODDLERS COURT (Pub 123 (2/18)), https://public.courts.alaska.gov/web/forms/docs/pub-123.pdf.

which it relied for its finding of waiver, does list the three possible routes to "permanency" as "reunification, adoption, or guardianship," but the court's oral explanations repeatedly emphasized that a successful permanency meant family reunification.

This focus carried through the case, as the court praised and encouraged Edna without mentioning the possibility that her efforts would be insufficient to prevent an expedited termination. By November, when OCS filed the petitions to terminate parental rights, Edna had successfully completed detoxification and was in residential treatment. The court told her that these steps marked "a tremendous step in the right direction": "[W]hen I read that in your report, I just put the paper down and stopped for a minute and I was so excited . . . that I couldn't keep reading." The court told her, "We're going to keep doing exactly what we've been doing and that is trying to achieve reunification within this year or so of time." The prospect that the case would end soon in termination of parental rights instead was not mentioned even as the lawyers discussed on the record how to best accomplish service of the termination petitions.

We are unable to conclude from this record that Edna and John were adequately advised of FIT Court's serious downside for parents: termination of their parental rights more quickly than it would happen outside of FIT Court.

We note one other ambiguity in how FIT Court was presented: whether the 12-month period was calculated from when the children were taken into custody or from when the parents opted into FIT Court. The answer to this question determines whether the parents would have 12 months to work with the FIT Court team on remedying the conduct that caused their children to be in need of aid or whether termination could occur months short of that, as in fact it did. The court started the 12-months-to-permanency timeline with the date the children were removed from their parents' custody, holding the termination trial 12 months after Chris was taken into custody (in March 2018) and

nearly 11 months after Ann was taken into custody (in April 2018). But Edna testified at trial that she believed the 12 months ran "from the time [she] opted in. So . . . [her] understanding when [she] signed [the opt-in form] was it'd be from May to May for [Ann], July to July for [Chris]." In other words, at the time of the March 2019 trial, Edna believed she should have had two more months to work on Ann's case and four more months to work on Chris's.

Edna's perception is understandable considering the information she was given. The court repeatedly used the phrase "within a year" or "within twelve months" when describing the permanency goal, but we have found only one instance when the court mentioned on the record the starting point of that one-year period. At the probable cause status hearing for Ann, two months after removal and while the parents were first considering FIT Court, the court explained, "If you're admitted into the FIT Court, . . . we're going to get [Ann] to permanency with you or without [you] *within 12 months of the date she was removed*. So, there is no time to waste." (Emphasis added.) At later hearings, including the hearing when Edna and John agreed to opt into FIT Court for Ann's case, the court emphasized the 12-month timeline without ever pinpointing its starting date. The opt-in forms acknowledged the parents' understanding that "the goal of FIT Court is for the minor(s) to reach permanency in 12 months" without indicating when that period began; the parents signed the forms on May 22, 2018. There was no clarification of this issue later in the hearing when Ann officially opted into FIT Court; the court explained the one-year disposition order given in FIT Court as meaning "that we don't have to address [the issue of OCS custody] again for a year as you're working your case plan and working toward reunification." The FIT Court policies and procedures manual is also vague on this issue, stating that "[t]he goal [of the FIT Court program] is to successfully complete the program between six and twelve months" without specifying the start date.

Uncertainty as to the start date was evident in Edna's February 2019 motion to continue the termination trial. The court repeatedly pointed to the time the children were removed from their parents' care as significant, but Edna's attorney countered that it was the parents' opt-in to FIT Court, not removal, that marked the beginning of the 12-month period: "[W]e as a FIT Court have identified this 12-month timeline . . . from when we get . . . our hands on these parents, because we understand that the services that we provide are . . . special." Other than the court's one mention of the removal date while the parents were first considering FIT Court, the attorney's understanding of the timeline is consistent with the explanation given to her client.

In sum, in light of the ambiguities and potential for serious misunderstanding in the way the 12-months-to-permanency goal was presented to Edna and John, we conclude that the record does not support Edna's and John's knowing and voluntary waiver of a CINA process that adequately took into account their individual circumstances.

## V.    CONCLUSION

We REVERSE and VACATE the order terminating Edna's and John's parental rights and REMAND for further proceedings.

STOWERS, Justice, with whom CARNEY, Justice, joins, concurring.

I concur in the court's opinion holding that the superior court erred in "adher[ing] to the FIT Court's preset timeline rather than making an individualized assessment of whether the parents had a reasonable time to remedy based on the facts of their children's cases, as required by statute." I note, however, that Edna argued on appeal that the superior court violated her right to due process by basing termination of her parental rights on the rigid FIT Court timeline rather than the specific facts of her children's cases. It is appropriate that the supreme court decides Edna's and John's appeals on statutory grounds and does not reach the parents' constitutional claims. This resolution respects the principle of constitutional avoidance.[1] But this does not mean that the superior court's error did not also violate the parents' due process rights; the superior court's rigid and arbitrary adherence to a fixed timeline without reference to the facts of the case may well have crossed the constitutional threshold.[2] A future case may bring this question to this court for resolution.

I write separately to highlight a larger problem: the existence and structure of the FIT Court itself. I think it is ludicrous to believe that parents with longstanding substance abuse problems or other intractable problems (including mental health issues) could, within the FIT Court's 12-month timeline possibly (1) receive substance abuse treatment, mental health treatment, parenting classes, and other necessary therapies;

---

[1]     *See Alaska Fish & Wildlife Conservation Fund v. State*, 347 P.3d 97, 102 (Alaska 2015); *Alaska Trademark Shellfish, LLC v. State*, 91 P.3d 953, 957 (Alaska 2004).

[2]     A particular concern is the FIT court's apparent elevation of the goal of permanency for children to the exclusion of parents' fundamental right to the "care, custody, and control of their children." *In re Tammy J.*, 270 P.3d 805, 813 (Alaska 2012) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).

(2) successfully complete these treatments, programs, and therapies; and (3) demonstrate, over some reasonable period of time, that they have internalized what they have learned and demonstrate their ability to safely parent their children. I think the entire premise of the FIT Court vis-á-vis these kinds of serious parental issues is invalid and for many parents illusory particularly given the FIT Court's failure to ensure that the promised wraparound services are provided.[3] So in addition to reversing the termination orders in this case, I would (1) immediately suspend all further FIT Court proceedings, (2) return parents enrolled in the FIT Court to regular CINA proceedings, and (3) if there is interest in continuing a FIT Court-type of therapeutic court, require that an assessment of how such a court might be structured be presented to the supreme court for its review and approval.

---

[3]     "Wraparound services" is a term of art and requires holistic services delivered by a supportive, integrated team of providers. *See Wraparound Basics or What is Wraparound: An Introduction,* NATIONAL WRAPAROUND INITIATIVE (2020), https://nwi.pdx.edu/wraparound-basics/.