NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| NERA S., | ) |
| | ) Supreme Court No. S-18116 |
| Appellant, | ) |
| | ) Superior Court No. 3PA-19-00204 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT[*] |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1881 – March 9, 2022 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kristen C. Stohler, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Robert Kutchin, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

---

[*] Entered under Alaska Appellate Rule 214.

## I. INTRODUCTION

A mother appeals the termination of her parental rights to her Indian child,[1] arguing that the superior court erred by finding that the Office of Children's Services (OCS) made active efforts to prevent the breakup of her family. We disagree and affirm the termination order.

## II. FACTS AND PROCEEDINGS

Nera S.[2] has a long history of involvement with OCS. Jerome is the fourth child removed from her care by OCS. In November 2019 OCS received a report that Jerome's father Jed C. had been attacked in a drug deal while one-year-old Jerome was present. Troopers had responded to the incident and later contacted OCS. Jed was taken to the emergency room and admitted to hospital staff that he had used methamphetamine recently.

OCS began its investigation soon after receiving the report. OCS workers accompanied Jed's probation officer to the "compound" where Jed's family lived with another family that was under OCS investigation. The other family slept in a bedroom while Jerome and his parents slept between the bedroom and the kitchen. The OCS workers saw "a lot" of needles in a can on the bedroom floor but no drug paraphernalia outside the bedroom. There were also spent cartridge casings "throughout the house" and "where everybody was sleeping."

Nera agreed to a drug test, which was positive for methamphetamine, amphetamine, and opiates. And Jed's probation officer gave an OCS worker a copy of Jed's signed admission to using methamphetamine. Because Nera had a domestic

---

[1]    *See* 25 U.S.C. § 1903(4) (defining "Indian child").

[2]    We use pseudonyms to protect the family's privacy.

violence protection order against the woman who lived with them, that woman was arrested for violating the order. Based on Jed and Nera's drug use and the violence and drug paraphernalia in the home, OCS assumed emergency custody of Jerome. The next day Jerome's hair follicle test was positive for marijuana, amphetamine, and methamphetamine.

## B.    Proceedings

In June 2020, approximately six months after taking emergency custody of Jerome, OCS filed a petition to terminate Jed's and Nera's parental rights. Jed and Nera failed to appear for the adjudication hearing in September; the court found, based upon OCS's offer of proof, that Jerome was in need of aid due to his parents' substance abuse.[3]

The termination trial was held over the course of two days in December 2020 and January 2021. OCS presented five witnesses. The initial OCS caseworker testified that she immediately scheduled twice-a-week visits between Jerome and his parents. She stated that she asked both parents to obtain a substance abuse assessment and that she provided them with "multiple options" because she usually left it up to parents to decide where to follow up. The caseworker also testified she arranged for hair follicle testing and an initial urinalysis (UA) appointment. She testified that neither Jed nor Nera completed substance abuse assessments. The caseworker also stated that they failed to show up for the UA appointment but that they did provide samples for hair follicle testing. The caseworker testified that she provided taxi vouchers to Jed and Nera so they could attend visits and that she asked them to identify relatives who could care for Jerome. The caseworker stated that she helped them complete applications for public housing and that she "fax[ed] off packets for them."

---

[3]      *See* AS 47.10.011(10).

The caseworker testified that after her initial contact with the parents, it was difficult to reach Jed and Nera. She reported that "numerous" calls and texts went unanswered. She acknowledged some success contacting them to set up visits, but many of those attempts also went unanswered.

The second caseworker, who was assigned a month after OCS opened the case, testified next. She also said it was difficult to contact Jed and Nera, explaining that it took a month of texting, emailing, calling, and sending certified letters before she was able to meet with them to discuss their case plans.

At the meeting she went over each parent's case plan. Both parents needed to demonstrate a pattern of sobriety; provide a safe and nurturing home free from violence; and demonstrate parenting ability while providing for Jerome's needs. The case plans also required them to provide current contact information and to maintain regular contact with OCS.

The caseworker testified that she had explained to Jed and Nera that it was important for them to work on their case plans, but they told her they would not participate because of their past experiences with OCS. They also refused to sign releases of information to allow OCS to monitor their progress by contacting service providers.

The caseworker testified that the only case plan activity Jed and Nera occasionally engaged in was visits. She testified that she often attended these visits to talk to them about working on their case plans or see if there was anything she could help them with. The caseworker testified that Jed and Nera missed, failed to confirm, or cancelled 17 visits with Jerome between February and October 2020. She testified that, like her predecessor, she offered Jed and Nera transportation vouchers to little avail, and

visitation was cancelled after they missed three visits in a row. Nera later asked to resume visits but never responded to OCS's attempt to schedule the visits.

OCS next presented a police officer who had stopped a U-Haul truck Jed and Nera were driving in September 2020, just a few months prior to the termination trial. When the officer searched the truck cab at the request of Jed's probation officer, he found methamphetamine paraphernalia and a handgun. A further search of the truck pursuant to a search warrant turned up approximately 11 grams of cocaine and 7 grams of methamphetamine in a safe belonging to both Jed and Nera. The officer testified there was also a "shocking amount of uncapped needles inside the U-Haul," and as a result he could not safely complete the search. He also reported finding aluminum foil that appeared to have been used to consume heroin or other drugs "littered throughout the cab." Jed was arrested for a probation violation and charged with a drug felony; Nera was not charged.

OCS next presented an expert witness as required by the Indian Child Welfare Act (ICWA)[4] The expert based her opinion on her review of OCS records from Jerome's case as well as the case involving his older siblings. The expert testified that Jed and Nera's "continued demonstration of not making behavioral change," their failure to work with OCS, and the impact of missed visits on Jerome would cause him substantial physical or emotional harm if he were returned to his parents. The expert acknowledged that six months after removing a child was "probably a little early" for

---

[4]     25 U.S.C. § 1912(f) (requiring expert testimony by qualified expert witnesses prior to termination); *see also* 25 C.F.R. § 23.122 (2016) (detailing the grounds for qualifying an ICWA expert).

OCS to file a termination petition but that it was not "unheard of," particularly given Jed and Nera's history of not cooperating in the case plans for their older children.

The superior court issued a written order terminating Jed and Nera's parental rights. The superior court found that OCS had satisfied each of the requirements to terminate parental rights, including finding by clear and convincing evidence that OCS made "active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family . . . ."

The court found that OCS made referrals for treatment and testing with multiple providers and that OCS provided the parents bus and taxi vouchers for them to get to appointments and visits. The court found that OCS made "extensive" efforts to find foster homes for Jerome, including flying Jed's mother to Alaska and also working with Jerome's tribe. When Jed and Nera did not respond to messages from OCS, caseworkers contacted them at visits and attempted to reach them at home. The court found that despite caseworkers' limited success reaching the parents, OCS continued to attempt contact at least once per month.

The court also referred to its adjudication finding that "the parents had refused to engage in any case plan activities, were often out of contact with [OCS] for extended periods of time, and only minimally participated in court proceedings." It then found that Jed and Nera's "lack of participation in services designed to address their substance use did not improve between the adjudication trial and the [termination trial]" and that they had stopped attending visits with Jerome.

Nera appeals the termination of her parental rights.[5] She argues that the superior court erred by finding OCS made active efforts and that OCS filed the termination petition too soon after taking custody of Jerome.

## III. STANDARD OF REVIEW

"Whether the state complied with the 'active efforts' requirement of [ICWA] is a mixed question of law and fact."[6] "[W]e review the trial court's factual findings for clear error and its legal determinations de novo."[7] And we "will find clear error only when a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[8]

## IV. DISCUSSION

In addition to the findings required under state law to terminate parental rights, ICWA requires a finding that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[9] Active efforts are "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child

---

[5] Jed does not participate in this appeal.

[6] *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 550 (Alaska 2017) (alteration in original) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[7] *Id.* (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 322 P.3d 842, 849 (Alaska 2014)).

[8] *Id.* (quoting *David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 P.3d 767, 774 (Alaska 2012)).

[9] *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 761 (Alaska 2009) (quoting 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B)).

with his or her family."[10]  OCS efforts are active when a "caseworker takes the client through the steps of the plan,"[11] but efforts are passive when the client is merely referred to services or "where . . . the client must develop his or her own resources . . . ."[12]  We review OCS's "involvement in its entirety"[13] because active efforts are "fact-dependent" and "are to be tailored to the . . . circumstances of the case."[14]  "OCS has discretion to prioritize which services should be provided to a parent based upon the issues identified in her case."[15]

"Although a parent's 'lack of effort does not excuse OCS's failure to make and demonstrate its efforts,' a court may consider a parent's 'demonstrated lack of willingness to participate' when evaluating active efforts."[16]  And the superior court may

---

[10]  25 C.F.R. § 23.2 (2021).

[11]  *Dale H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 235 P.3d 203, 213 (Alaska 2010) (quoting *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[12]  *Id.*

[13]  *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 366 (Alaska 2021) (quoting *Dale H.*, 235 P.3d at 213)).

[14]  *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 982 (Alaska 2019) (quoting 25 C.F.R. § 23.2 (2016)).

[15]  *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1071 n.25 (Alaska 2018).

[16]  *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 902 (Alaska 2021) (first quoting *Bill S.*, 436 P.3d at 983; and then quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

consider a parent's history with OCS and substance abuse "as a predictor of future behavior."[17]

Parents must also be given "reasonable time[] to remedy the conduct or conditions in the home that place[d] the child in substantial risk . . . ."[18] But "OCS determines when to file a petition [to terminate parental rights] based exclusively on the best interests of the child;" not based upon a "specific number of months or by reference to parents' needs."[19]

Nera argues that OCS failed to make active efforts because it did nothing to help her "ameliorate the poverty and substandard housing that plagued" her family or to address her underlying mental health issues. She also argues that OCS did not allow her reasonable time to remedy the reasons for Jerome's removal.

### A.    The Superior Court Did Not Err By Finding That OCS Made Active Efforts.

The record does not support Nera's contention that OCS did "absolutely nothing" to assist her with housing. OCS prioritized three issues in its case plan for Nera, and one was the need for a "safe and nurturing home." As part of OCS's active efforts to reunify the family, one caseworker "assisted [Jed and Nera] . . . with getting

---

[17]    *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003); *see also Amy M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 320 P.3d 253, 258 n.19 (Alaska 2013) (referencing long history of substance abuse and history with OCS); *Martha S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 268 P.3d 1066, 1080 n.28 (Alaska 2012) ("Trial courts often correctly rely upon a family's history with OCS to make findings.").

[18]    AS 47.10.088(a)(2)(B). *See also Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1104-09 (Alaska 2011).

[19]    *Christina J.*, 254 P.3d at 1107.

forms to public assistance" by running "back and forth" between "faxing off packets for them" and supervising their visit with Jerome. Caseworkers' efforts to assist Nera to obtain housing, like other efforts to reunify her with Jerome, were frustrated by Nera's "conduct [that] 'rendered provision of services practically impossible.' "[20] Not only did OCS make active efforts to reunify Nera with Jerome, it made specific efforts to address Nera's need for housing.

Nera also argues that OCS failed to consider or address her "possible underlying mental health needs." But she does not point to any evidence that she had, or that OCS was aware of, any mental health needs.

"OCS is not required to refer a parent to specific support programs,"[21] and it "has discretion to prioritize which services should be provided to a parent based upon the issues identified in her case."[22] OCS focused on Nera's substance abuse in its efforts to reunify her with Jerome. But Nera did not obtain any of the assessments that OCS requested nor did she provide OCS with releases of information — which might have

---

[20]    *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 433 (Alaska 2015) (quoting *E.A. v. State, Dep't of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

[21]    *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 529 (Alaska 2013) (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1115 (Alaska 2011)).

[22]    *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1071 n.25 (Alaska 2018).

provided OCS with information identifying mental health issues that needed to be addressed.[23]

OCS actively helped Nera to apply for housing and had no reason to prioritize Nera's "possible" mental health issues when there was no evidence that such issues led to Jerome's removal. The superior court did not err when it found that OCS made active efforts.

**B. It Was Not Premature To File A Termination Petition Six Months After Jerome Was Removed.**

Nera argues that OCS acted prematurely when it filed a termination petition six months after taking emergency custody of Jerome. Alaska's Child in Need of Aid statutes do not establish "a minimum time OCS must wait before filing,"[24] but parents must be given "a reasonable time[] to remedy the conduct or conditions" that caused a child to be in need of aid.[25] A "reasonable time" is not defined as "a specific number of months or by reference to parents' needs, but as 'a period of time that serves the best interests of the child . . . .' "[26] In *Christina J.*, we affirmed the termination of parental rights where OCS had filed a termination petition nine months after removal and the trial

---

[23] OCS's expert testified that continued struggles with addiction "typically [indicated] an underlying mental health issue" but that she could not confirm this was the case for Nera.

[24] *Edna L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 477 P.3d 637, 644 (Alaska 2020) (quoting *Christina J.*, 254 P.3d at 1106).

[25] AS 47.10.088(a)(2)(B).

[26] *Christina J.*, 254 P.3d at 1107 (quoting AS 47.10.990(30)).

took place four months later.[27] We considered "not just the child's need for permanency but also the mother's 'failure to make any real progress toward' completing treatment."[28]

The trial in this case similarly occurred about 13 months after OCS removed Jerome. The superior court found that Nera had failed to participate in services before the adjudication hearing and that her "lack of participation in services . . . did not improve between the adjudication trial and the [termination trial]," noting that since the adjudication Nera had been stopped in a truck littered with a "shocking" amount of drugs and related paraphernalia. The superior court did not err when it accepted the termination petition and subsequently terminated Nera's parental rights.

V.    **CONCLUSION**

The superior court's termination order is AFFIRMED.

---

[27]    *Id.* at 1106.

[28]    *Edna L.*, 477 P.3d at 644 (quoting *Christina J.*, 254 P.3d at 1107). We emphasized that whether "13 months is [a] 'reasonable time' for parents to remedy their conduct" depends on the circumstances. *Christina J.*, 254 P.3d at 1108.