CARNEY, Justice.
*110 I. INTRODUCTION
A father appeals the superior court's decision terminating his parental rights. He argues that the superior court clearly erred in finding that he abandoned his son under the Child in Need of Aid (CINA) statutes. He also argues that there was insufficient evidence to support termination, claiming that the record does not support the superior court's findings that returning his son to his care would risk emotional or physical harm and that termination was in his son's best interests. Because the superior court did not clearly err in making these findings, we affirm the superior court's decision.
II. FACTS AND PROCEEDINGS
A. Facts
Steve H. and Lucy A. are the parents of Donald,[1] an Indian child[2] born in April 2013. By the time Donald was born, Steve and Lucy were no longer in a relationship and Steve no longer lived in Anchorage. Donald lived with Lucy until the Office of Children's Services (OCS) assumed emergency custody of him due to alcohol-related neglect shortly after he was born. Although Steve knew that Lucy had substance abuse problems, he left Donald in her care. When OCS took emergency custody of Donald in June 2013, Steve was "unreachable." Donald was placed in a foster home.
OCS developed an initial case plan for the family. Steve was directed to maintain housing, have consistent contact with Donald, and participate in parenting classes. OCS returned Donald to Lucy in September 2014 because she had made significant progress in her case plan and was actively participating in substance abuse treatment. But Lucy relapsed after about 8 months.
In May 2015 OCS received reports that Lucy was drinking while caring for Donald, and that Donald was "dirty, hungry[,] and upset." When OCS contacted Lucy about the reports, her speech was slurred, her eyes were dilated, and she smelled of alcohol. Lucy informed the OCS caseworker that she had been drinking but that she was sobering up. She later admitted that she had used cocaine as well. OCS took emergency custody of Donald for the second time.
By this time Steve had returned to Anchorage. Steve acknowledged to OCS that he knew Lucy had been drinking, but said that he had not informed OCS or the police because he did not know where she and Donald were. The day after removing Donald from Lucy, OCS held a team decision meeting. Both parents participated, but neither agreed to allow Donald to be placed with the other. OCS was not willing to return Donald to Lucy, and wanted to assess the safety of Steve's home before deciding whether to place Donald there. In the meantime Donald was placed with his previous foster parent.
OCS concluded that Steve's home was not suitable for Donald. Steve's housemate had a history of involvement with OCS and Steve had a history of substance abuse. Because of this history, OCS asked both Steve and his housemate to submit to drug testing. Although he initially agreed, Steve changed his mind and refused to provide a urine sample. Because this raised concerns that Steve *111 might be abusing substances, OCS suggested a hair follicle sample instead of urinalysis (UA). Steve again refused, this time stating that he could not provide a hair sample because of his religion. Without a test result to rule out substance abuse, OCS was unable to determine that Steve's home was a safe environment for Donald.
Throughout the summer of 2015 OCS had difficulty contacting and staying in touch with Steve. Steve later advised OCS that this was because he had been in a car accident, which left him "basically out of commission" and recovering from injuries for a long time. After months without any contact, a new OCS caseworker was finally able to meet with Steve in September 2015. The caseworker assessed his home, and determined the home was suitable for Donald despite Steve's unwillingness to participate in a drug test. A trial placement began in October 2015.
It lasted less than a month. A few weeks after placing Donald with Steve, OCS learned that the other children living in the home with Steve and his housemate had tested positive for cocaine. OCS removed all the children, including Donald, from the home, but also tried to create a short-term safety plan that would allow Donald to stay with Steve. OCS again asked Steve to participate in drug testing as part of this safety plan. Steve again refused to participate, even after OCS offered to provide him transportation when he said he had no way of getting to the appointments. Steve instead told OCS "to just go ahead and have [Donald] moved from the home."
Steve finally provided a UA in November 2015, which tested negative for illegal substances. But he failed to show up for any of the other 12 UA appointments scheduled between November 2015 and March 2016 that OCS required before it would consider returning Donald to him. Steve and his housemate then left Anchorage again, blaming OCS's removal of Donald and the other children for causing them to lose their housing. Steve informed OCS that his move was only temporary, but he ultimately remained on the Kenai Peninsula for the majority of 2016 because he found employment.
In the first several months of 2016 while Steve lived on the Kenai Peninsula, OCS's contact with him was limited. The caseworker testified that after Steve moved, "he fell out of contact" with OCS. By August the case was reassigned to a third caseworker who also had difficulty contacting Steve. Because it was not in contact with Steve, OCS updated his case plan without his participation in September. The new case plan required Steve to contact OCS every other week, meet in person with the OCS caseworker monthly, regularly communicate and visit with Donald, and participate in either a random UA program or hair follicle testing.
The caseworker testified that because Steve had advised that he would not participate in a hair follicle test for religious reasons, OCS requested that he provide 30 days of clean UAs in lieu of the hair follicle test. But Steve provided only 12 clean UAs, claiming his work schedule prevented him from making the random UA appointments. A total of 55 UAs were scheduled for him between November 2015 and December 2016.[3]
Steve occasionally visited Donald during this time, but the visits were sporadic. OCS worked with Steve to accommodate his schedule, changing the location and time of the visits, but he still missed visits.
Steve made little progress maintaining communication with OCS in 2017. Steve testified that he had to travel because of deaths in his family, yet provided no timelines for these absences. He testified that he had to leave Alaska to manage both his mother's and grandmother's affairs after their deaths. But the OCS caseworker stated that Steve never told her when he was leaving and never provided contact information while he was gone.
By the time of the termination trial in early 2018, Steve was living in Whittier. OCS continued struggling to maintain communication with him because he did not provide updated contact information or a current address. At trial the OCS caseworker testified that she last spoke with Steve in December 2017 to schedule a visit with Donald. She *112 stated that Steve visited Donald once between the trial dates, but missed two other scheduled visits. She also testified that before they spoke in December, it had been roughly six months since she had any contact with Steve.
B. Proceedings
OCS petitioned to terminate Steve's and Lucy's parental rights in February 2017. Trial was held over three days in January and February 2018. Three OCS caseworkers and an expert witness testified for OCS. Steve testified on his own behalf; he presented no other witnesses.
At the end of trial, the superior court found Donald to be a child in need of aid under AS 47.10.011(10) (parental substance abuse) due to Lucy's conduct. The superior court found Donald to be a child in need of aid under AS 47.10.011(1) (abandonment) with respect to Steve. It found that Steve had abandoned Donald as defined by AS 47.10.013(a),[4] which constitutes abandonment under AS 47.10.011(1).[5] The superior court further found that OCS had made active efforts, and had shown "by more than a preponderance" of the evidence that it was in Donald's best interests to terminate the parental rights of both parents. Lastly, the superior court found that returning Donald to either parent would risk substantial mental and physical harm. The court therefore terminated the parental rights of both parents.
Steve now appeals.[6]
III. STANDARD OF REVIEW
Whether a parent abandoned his or her child is a factual finding that we review for clear error.[7] Whether "a parent's continued custody of a child will likely result in the child suffering serious emotional or physical damage" and whether terminating parental rights is in a child's best interests are also factual findings reviewed for clear error.[8] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[9]
IV. DISCUSSION
A. The Superior Court Did Not Clearly Err By Finding That Steve Abandoned Donald.
Alaska Statute 47.10.011(1) states that a court may find a child to be in need of aid if it finds by a preponderance of the evidence that "a parent ... has abandoned the child as described in AS 47.10.013." Alaska Statute 47.10.013(a), in turn, "provides specific examples of conduct that will be considered abandonment."[10] When done "without justifiable cause," such actions or omissions by a parent constitute proof of abandonment sufficient to support adjudicating a child in need of aid.[11]
*113 The superior court relied on several of the examples listed in AS 47.10.013(a) to find that Steve abandoned his son. We recently affirmed that, based upon this statute, a "court may find abandonment of a child if a parent ... has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult."[12] Steve's argument that the court was also required to find that his conduct satisfied the two-part common-law test we have applied in other abandonment cases[13] misunderstands termination of parental rights. Because termination of parental rights is based on statute, a court must find that a parent's conduct satisfies the statutory criteria before it can order termination.[14] A common-law test, by definition, is not based on statute, so we therefore apply the statutory rule governing abandonment.[15]
The superior court based its conclusion that Steve abandoned Donald under AS 47.10.013(a) primarily on two facts: Steve's prolonged absences and failure to regularly visit or communicate with Donald; and his failure to meaningfully participate in OCS's case plan, which required him to submit to drug tests, regularly visit Donald, and maintain communication with OCS. These findings were supported by the evidence and were not clearly erroneous. But Steve now argues that his actions, even if true, were justified. He argues that drug testing was unnecessary, and also that he was prevented from participating because of his religion and work schedule. He also argues that he failed to regularly visit or communicate with Donald because of his "hectic work schedule" and deaths in the family that required him to be out of state for extended periods.
Steve claims that drug testing was unnecessary because he "did not have a drug problem," he never tested positive for illegal substances, and any allegations of substance abuse "were retaliatory in nature." But the superior court found that requiring Steve to participate in drug testing was reasonable. It concluded that evidence of Steve's history of substance abuse, combined with Steve's and his housemate's initial agreement and subsequent refusal to submit to drug testing to determine whether their home was suitable for Donald, rightfully raised concerns with OCS about potential drug use. In addition, the fact that the other children in Steve's home tested positive for illegal substances provided a basis to request that the adults submit to testing for those substances. Steve and his housemate's continued refusal to participate in drug testing and Steve's invitation to OCS to take Donald into its custody further supported OCS's requirement for testing to rule out any abuse of substances by Steve. These facts support the court's finding that it was reasonable for OCS to require Steve to participate in either a hair follicle test or provide 30 days of clean UAs; that finding is not clearly erroneous.
Steve also argues that his religion and work schedule prevented him from participating in drug testing. But Steve provided no evidence, other than his own conclusory testimony, to either support the contention about his religion or corroborate his work schedule. And OCS offered evidence to the contrary: After Donald was first removed from Steve's custody due to concerns about illegal substances in his home, Steve claimed he was unable to get transportation to the testing facility. But when OCS offered to provide transportation, he refused. To simplify the process, OCS offered a hair follicle test in lieu of UAs but he refused this because of his religion. In an effort to accommodate his religious objection, OCS asked Steve to provide 30 days of clean UAs, but he failed to do so. Neither at the times OCS made its requests *114 nor at trial did Steve ever provide any document or witness to corroborate either his work schedule or to support his contention that he was forbidden from providing a hair sample for testing for religious reasons. Based on these facts, the superior court did not clearly err in finding that Steve's failure to participate in his case plan was not justified.
Steve also argues that the superior court erred by considering his long absences and failure to visit or communicate with Donald because they were due to his work schedule and travel for deaths in the family. He claims that many of his absences were caused by events that only happen "once in a person's life." But again, aside from his own testimony, Steve provided no evidence of his actual schedule or that it prevented him from attending his visits with Donald. And an OCS caseworker testified that even though she asked Steve to inform her if and when he would be gone, Steve never provided any information to OCS with his whereabouts or contact information during these absences. And although his absences due to deaths in the family may account for some missed visits, they do not excuse his failure to maintain contact with Donald or OCS. As OCS points out, "not a single one of these departures indicates why [Steve] would be unable to communicate with Donald. They also do not provide any answer for why he could not maintain regular and consistent visitation with Donald even when he was available." It was not clear error for the superior court to find that Steve's failure to meaningfully maintain contact or communication with Donald and OCS was "without justifiable cause."[16]
For these reasons, the superior court did not clearly err in finding that Steve abandoned Donald.
B. The Superior Court Did Not Err By Finding That There Was Sufficient Evidence To Terminate Steve's Parental Rights.
1. Risk of Harm
To terminate parental rights to an Indian child, the superior court must find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child."[17] This finding "requires proof that the parent's conduct is unlikely to change and will likely cause serious harm to the child in the future."[18] "Although the court must focus on risk of future harm rather than past injury, past failures may predict future conduct."[19]
In arguing that the superior court erred by finding that his continued custody would pose a substantial risk of physical harm to Donald, Steve relies on the mistaken premise that he did not abandon Donald and that it was only Lucy's conduct that led OCS to take custody. He also wrongly contends that the superior court improperly relied on his "hectic schedule over the last few years." He lastly seems to argue that the court improperly considered the fact that he placed Donald in Lucy's care, despite knowing she abused substances, "[b]ecause OCS also believed that Lucy was a responsible caregiver." But the superior court did not clearly err by finding that Steve abandoned Donald. Likewise, the superior court did not clearly err by finding that Steve had not remedied his harmful conduct. It was therefore not error for the superior court to conclude that returning Donald to Steve posed a substantial risk of mental or physical harm to Donald.
First, there is evidence that OCS gave Steve roughly four years to remedy his behavior before it pursued termination of parental rights and that he did not remedy this *115 conduct. The OCS caseworker actively tried to coordinate times for Steve to visit Donald that accommodated his work schedule, but Steve continued to miss appointments. There is evidence that Steve failed to provide updates on his travel plans and contact information. Steve testified that he called and left messages with the OCS caseworker advising her of his travel plans yet claims she never returned his calls. But it is for the trial court, not this court, to weigh the evidence and determine witness credibility.[20]
It is undisputed that Steve failed to communicate in any meaningful way with OCS or Donald throughout the pendency of the CINA case. Steve claims this was because of his work schedule and deaths in the family, but, as discussed above, these excuses could only account for his whereabouts and possibly some missed visits; they do not explain why he was unable to maintain communication or contact with his son for significant periods of time.
The superior court found that based on his harmful conduct throughout the pendency of the CINA case, Steve was unlikely to stop his harmful behavior. The court found that this behavior of "stop in, play a little while, disappear again simply [was] not adequate to parent" because it meant that he could not "properly feed, supervise, educate, provide medical care, [or] provide emotional care to the child" and created the same risk as Lucy's substance abuse.
We find no merit in Steve's argument that the superior court abused its discretion by improperly relying on the fact that he left Donald in Lucy's care, despite knowing she abused substances. He claims the court should not have considered this fact because OCS also thought Lucy was a reliable caretaker. But OCS only placed Donald back in Lucy's care after she made significant progress in her case plan. When Lucy relapsed, OCS immediately took custody of Donald. In contrast, when Donald was born, Steve knew that Lucy abused substances yet chose to leave him in her care. Additionally, when Lucy relapsed in 2015 while Donald was in her care, Steve knew she abused alcohol yet purposefully chose not to inform either the police or OCS. Both instances show Steve's conscious decision to leave Donald in the care of someone he knew to potentially be dangerous and unreliable.
Therefore the superior court did not clearly err when, based upon the evidence, it found that returning Donald to Steve's custody would result in substantial risk of harm.
2. Best Interests
Before a court may terminate parental rights to an Indian child, it must find "by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[21] Alaska Statute 47.10.088(b) lists several factors that courts may consider when determining whether terminating a parent's rights is in a child's best interests, but these factors "are not exclusive and the superior court need not accord a particular weight to any given factor."[22] "The superior court may [also] consider ... the need for permanency, and the offending parent's lack of progress."[23]
The superior court found by clear and convincing evidence that "[Steve] failed to remedy the conduct and conditions ... that place[d] [Donald] at substantial risk of harm" and that terminating his parental rights was "the only option that is available that could have some reasonable success in terms of providing some stability and hope in [Donald's] future."
Steve argues that it was in Donald's best interests to give Steve "more time to work with OCS" instead of terminating his parental rights because "the record shows that Donald had a bond with his father, ... [t]here were not any credible allegations that Steve abused substances ... [,] [and] Steve had a simple case plan." But Steve fails to *116 explain why any of these facts render the superior court's best-interests finding clearly erroneous, and ignores the fact that "[t]he superior court may also consider any other facts relating to the best interest of the child,"[24] including the harm caused by a parent's absence and unavailability to parent.
Moreover, "although the superior court did not expressly mention the factors listed in AS 47.10.088(b), it did make factual findings relevant to several of these factors."[25] As discussed above, there was evidence in the record to support the finding that Steve abandoned Donald and was absent and unavailable. In its oral findings, the superior court also emphasized that Donald had experienced years of "chaos" and upheaval throughout his short life, in large part due to Steve's absence. This is supported by the evidence that Donald had been placed in foster care three separate times within the first four years of his life. There was also evidence to support the finding that Steve had not remedied his harmful conduct and that his harmful conduct would continue. The superior court therefore found that it was in Donald's best interests to terminate Steve's parental rights so he could have stability and permanency. We have consistently held that it is appropriate to consider a child's need for permanency and stability when making a best-interests finding.[26]
Accordingly, the superior court did not clearly err in finding that it was in Donald's best interests to terminate Steve's parental rights.
V. CONCLUSION
The superior court did not clearly err by finding that Steve abandoned his son or by terminating his parental rights. We AFFIRM the superior court's decision.

Pseudonyms are used to protect the family's privacy.

Indian Child Welfare Act, 25 U.S.C. § 1903(4) (2012) (defining "Indian child" to mean "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

The other 43 scheduled UAs were marked as "no show."

The court found that Steve: (1) left Donald with someone else without providing for him or communicating with him for three months; (2) made only minimal efforts to support or communicate with Donald; (3) failed to regularly visit with Donald for at least six months; (4) failed to participate in a plan to reunite him with Donald; and (5) was unwilling to provide care, support, or supervise Donald. AS 47.10.013(a)(1)-(4), (8).

Duke S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 433 P.3d 1127, 1132 (Alaska 2018).

Lucy is not involved in this appeal.

Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 310 P.3d 943, 949 (Alaska 2013).

Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 291 P.3d 957, 962 (Alaska 2013).

Sherman B. , 310 P.3d at 949 (quoting Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 249 P.3d 264, 269-70 (Alaska 2011) ).

Duke S. , 433 P.3d at 1132 (quoting G.C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 67 P.3d 648, 651 (Alaska 2003) ).

AS 47.10.013(a) ; see also Trevor M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 368 P.3d 607, 610 (Alaska 2016) ("[T]he various ways abandonment can be shown under AS 47.10.013(a) are listed disjunctively, and a single adequately supported finding is therefore enough to establish that [the child] was a child in need of aid."); Duke S. , 433 P.3d at 1132 ; Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 235 P.3d 203, 210 (Alaska 2010).

Duke S. , 433 P.3d at 1132 (omission in original) (quoting AS 47.10.013(a) ).

See Sherman B. , 310 P.3d at 949-50 ("We have articulated a two-part test for reviewing cases of abandonment: (1) [t]here must be parental conduct evidencing a willful disregard for parental obligations, leading to (2) the destruction of the parent-child relationship." (alteration in original) (quoting Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 251 P.3d 330, 335 (Alaska 2011) )).

See AS 47.10.088.

See AS 47.10.011(1) ; AS 47.10.013(a).

AS 47.10.013(a).

25 U.S.C. § 1912(f) ; CINA Rule 18(c)(4) ; see also AS 47.10.088(a)(2)(B).

Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 400 P.3d 99, 108 (Alaska 2017) (quoting Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 291 P.3d 957, 964 (Alaska 2013) ).

Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 212 P.3d 756, 767 (Alaska 2009).

Dara S. v. State, Dep't of Health &Soc. Servs., Office of Children's Servs. , 426 P.3d 975, 989 (Alaska 2018).

CINA Rule 18(c)(3) ; see also AS 47.10.088(c).

Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 234 P.3d 1245, 1263 (Alaska 2010).

Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 336 P.3d 1258, 1271 (Alaska 2014) (footnotes omitted).

Id. (emphasis added).

Joy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 382 P.3d 1154, 1167 (Alaska 2016).

See id. at 1166 ; Casey K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 311 P.3d 637, 648 (Alaska 2013) ; Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 289 P.3d 924, 933 (Alaska 2012) ("We have repeatedly recognized that the best-interests analysis may include the child's need for permanency at the time of the termination trial.").