NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| D.A.M., | ) |
| | ) Supreme Court No. S-18241 |
| Appellant, | ) |
| | ) Superior Court No. 1SI-20-00004 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT[*] |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1914 – August 31, 2022 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Sitka, Amy Mead, Judge.

Appearances: Julia Bedell, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Katherine H. Lybrand, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I.      INTRODUCTION

A father appeals the termination of his parental rights, arguing the superior court erred by finding that he had abandoned his child and that the Office of Children's Services (OCS) made active efforts to reunify his family. We conclude the superior

---

[*]      Entered under Alaska Appellate Rule 214.

court did not err and affirm its termination order.

## II.    BACKGROUND

D.A.M. and K.J. are the parents of nine-year-old K.M.,[1] who is an "Indian child"[2] as defined by the Indian Child Welfare Act (ICWA).[3] OCS first became involved with K.M. in Sitka in 2012 after the newborn suffered withdrawal symptoms from his mother's drug use, but OCS had previously contacted K.J. and D.A.M. about their older children.[4] D.A.M. was in a relationship with K.J. at the time and raising K.M. with K.J. OCS created a safety plan with the parents and opened an in-home services case. Because of K.J.'s severe and continued drug use, D.A.M. took over care of their son in 2013. Although OCS received positive reports about D.A.M.'s parenting, it continued to have concerns about his drug use.

In 2016 OCS created an out-of-home safety plan for K.M. with an aunt in Juneau. When that arrangement failed, OCS filed a petition for temporary custody, which was granted. OCS placed K.M. with the aunt. Without the parents' participation OCS created case plans for each of them, identifying substance abuse and parenting concerns. When OCS was able to contact D.A.M., it offered him assistance scheduling

---

[1]     Initials are used to identify family members.

[2]     *See* 25 U.S.C. § 1903(4).

[3]     *Id.* §§ 1901-1963. ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." *Id.* § 1902.

[4]     OCS contacted K.J. in 2010 when her daughter was born with drug exposure. It worked with K.J. in Anchorage and when the family returned to Sitka, but did not seek custody of the child, who was ultimately placed in a tribal guardianship. OCS became involved with D.A.M. in 2011 due to concerns that his older son was exposed to substance abuse in D.A.M's home.

mental health and substance abuse assessments, drug testing, bus passes to get to appointments, and monthly trips from Sitka to Juneau to visit K.M. D.A.M. did not participate in any of the services OCS offered, but he obtained a substance abuse assessment on his own, which diagnosed him with severe opioid use disorder. D.A.M. completed treatment in 2017, but he was discharged from the aftercare group for bragging about his continued alcohol and marijuana use.

After neither parent made progress on substance abuse issues, both D.A.M. and K.J. agreed to appoint D.A.M.'s mother as K.M.'s guardian in 2017. OCS then closed the case. But the guardianship was terminated in 2019 after D.A.M.'s mother began abusing substances and leaving K.M. with other people, including with D.A.M. for two months in early 2018. OCS reopened the case, but closed it again after K.M.'s aunt was appointed co-guardian and resumed caring for him in Juneau. OCS reopened the case in late 2019 when the aunt requested to be removed as guardian.

OCS concluded that it was not safe to return K.M. to his parents because both were still abusing substances and D.A.M. had not participated in any scheduled visitation, was homeless, and was often unreachable. In November 2019 K.M. was placed with foster parents in Sitka, who are distant relatives. OCS continued to attempt to provide services to the family including case plans, visitation, referrals and assistance with treatment and transportation, coordination with K.M.'s Tribe,[5] and efforts to maintain contact with both K.J. and D.A.M.

OCS made numerous attempts to contact D.A.M. to engage him in case planning and reunification efforts. Caseworkers testified that they tried various phone numbers from which D.A.M. had previously called, sent letters to last known addresses

---

[5]     Both K.J. and D.A.M. are enrolled members of the same tribe, making it also K.M.'s tribe. *See* 25 U.S.C. § 1903(5) (defining "Indian child's tribe" as "tribe in which an Indian child is a member or eligible for membership").

in Sitka and Juneau, and asked the Tribe, K.J., the foster family, and others to provide D.A.M.'s contact information to OCS and to encourage D.A.M. to contact OCS caseworkers if anyone heard from him. OCS also assigned a secondary caseworker to arrange monthly visits between K.M. and D.A.M. Caseworkers were unable to contact D.A.M. and he did not try to contact them. D.A.M. did not otherwise try to arrange scheduled or informal visits; his only in-person contact with K.M., besides occasional chance meetings in the community, were an unannounced visit to the foster home and attending one of K.M.'s football games in 2020.

In November 2020 OCS petitioned to terminate K.J. and D.A.M.'s parental rights. A combined adjudication and termination trial was held May 18 and 19, 2021. OCS presented testimony from three caseworkers, K.M.'s aunt, his foster mother, D.A.M., and an expert witness on child welfare and family reunification. D.A.M. did not call any witnesses.

The first caseworker testified about OCS's long involvement with the parents beginning with their older children. The caseworker testified about the various services OCS had provided to K.J. since 2010. The caseworker also detailed the services D.A.M. received when he was caring for K.M., including referrals for behavioral health assistance, bus passes, basic supplies such as diapers and clothing, and assistance contacting in-home early learning program services. She testified that whenever possible, OCS worked to keep the family together by offering in-home safety planning or out-of-home safety planning during periods of guardianship or OCS custody, which included meeting with the parents to discuss expectations and offering drug testing, supervised visitation, and connections to social and tribal services.

The caseworker testified that when OCS reopened K.M.'s case in 2019 after his aunt asked to terminate the guardianship, OCS was unable to reestablish contact with D.A.M. She testified that she attempted to reach D.A.M. in various ways: asking the

police department, the Tribe, the foster parents, and K.J. if they had contact information and asking them to let D.A.M. know that OCS was looking for him if they encountered him; checking to see if D.A.M. was incarcerated or had any scheduled court dates; and sending letters to D.A.M.'s last known addresses in Juneau and in Sitka. The caseworker testified that OCS was not sure whether D.A.M. was staying in Sitka or moving back and forth between Sitka and Juneau as he had done previously. The caseworker testified that D.A.M. could have reached OCS in many ways, including visiting the Sitka OCS office in person, which remained an option even during the COVID lockdown.

Another caseworker also testified about his efforts to contact D.A.M. during this time and that he was unable to identify a mailing address, find a Facebook profile, or get D.A.M.'s contact information from other members of the family. The caseworker testified that K.M. and his guardians and foster parents reported D.A.M. only "sporadically" called during the guardianship or OCS custody periods, and he would occasionally run into K.M. in the community.

The secondary caseworker testified that she had not been able to create a visitation plan for D.A.M. because she could not reach him. K.M.'s aunt and his foster mother each testified that D.A.M. rarely visited K.M. and described difficulty reaching D.A.M.

D.A.M. acknowledged he was difficult to contact because he did not have a permanent number or a permanent address and that he knew OCS was looking for him but he did not contact OCS. D.A.M. testified that he had previous arguments and "misunderstandings" with OCS when he contacted them directly, so he preferred to communicate only through his lawyer.

D.A.M. also acknowledged that he did not regularly visit K.M. He testified that contact was difficult because he did not have a reliable phone, he moved often, he did not know the foster parents' number or their address, and he believed the OCS office

was closed during the pandemic. D.A.M. testified that he was "not sure" if his lack of consistent visits affected K.M. and that he did not believe the instability in K.M.'s life had an impact on the child's wellbeing. D.A.M. testified that he had not tried to find housing or employment but that he would do so once OCS returned K.M. to him.

The expert witness testified that K.M. faced a "serious risk of physical or emotional harm if returned" to his parents due to their substance abuse and D.A.M.'s failure to maintain consistent and reliable contact with K.M. She testified that both factors could result in K.M. feeling instability and having difficulty forming healthy attachments. The expert testified that D.A.M.'s "lack of emphasis on making sure that he is involved with his son despite his resource issues" indicated he had not remedied OCS's safety concerns.

The court concluded that OCS had proven the required elements to terminate both parents' rights to K.M.[6] The court found that there was clear and convincing evidence K.M. was a child in need of aid due to abandonment[7] and parental

---

[6] Before terminating parental rights to an Indian child, a superior court must find by clear and convincing evidence that: (1) a child is in need of aid under at least one subsection listed in AS 47.10.011; (2) the parent has not remedied within a reasonable time the conduct or conditions causing the child to be in need of aid such that returning the child to the parent would put the child at substantial risk of physical or mental injury; and (3) OCS has made active efforts to provide services to prevent the breakup of the family. AS 47.10.088(a); CINA Rule 18(c)(2)(B). The court must also find by a preponderance of the evidence that termination is in the child's best interests. AS 47.10.088(c); CINA Rule 18(c)(3). And the court must find beyond a reasonable doubt, using evidence including testimony of a qualified expert witness, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. CINA Rule 18(c)(4).

[7] AS 47.10.011 lists twelve bases upon which a child may be in need of aid. Subsection (1) authorizes finding a child in need of aid if "a parent . . . has abandoned the child . . . and the other parent is absent or has committed conduct or created

(continued...)

substance abuse.[8]

The court found that D.A.M.'s behavior constituted abandonment under three separate statutory subsections[9]: D.A.M. had not "provided any support or consistently maintained contact with K.M. for well over six months" or indeed "ever maintained regular visitation while K.M. has been in the State's custody"[10]; moreover, he "failed to engage in any efforts towards securing visitation . . . through OCS" or in "meaningful case planning."[11] The court found that, despite having positive interactions with K.M., D.A.M. acted more like "a favored . . . uncle" rather than developing "the kind of parent/child relationship expected under the law." And the court found that D.A.M. did not "acknowledge[] the negative effect this has had on [K.M.]."

The court found clear and convincing evidence that D.A.M. and K.J. failed

---

[7]    (...continued)
conditions that cause the child to be a child in need of aid."

[8]    AS 47.10.011(10) authorizes finding a child in need of aid if "the parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant," which "has resulted in a substantial risk of harm to the child."

[9]    AS 47.10.013(a) defines abandonment as "a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult." The statute lists circumstances that, if existing without a "justifiable cause," constitute abandonment. AS 47.10.013(a).

[10]    *See* AS 47.10.013(a)(2) (providing abandonment includes "instances when the parent . . . has made only minimal efforts to support and communicate with the child") and AS 47.10.013(a)(3) (providing abandonment includes "instances when the parent . . . failed for a period of at least six months to maintain regular visitation with the child").

[11]    *See* AS 47.10.013(a)(4) (providing abandonment includes "instances when the parent . . . failed to participate in a suitable plan or program designed to reunite" the family).

to remedy their conduct within a reasonable time and that "returning [K.M.] to either parent would place him at substantial risk of mental injury." The court explained that parents had to "demonstrate, over some reasonable period of time, that they have internalized what they have learned and demonstrate their ability to safely parent their children."[12] It found that neither parent had remedied the abandonment of K.M. because for years they were "unable to provide the kind of consistent, reliable contact a child needs from a caregiver." Though D.A.M. testified that "his lack of stable housing and good contact information make it difficult" to remain in touch, the superior court found "these circumstances are in large part [D.A.M.'s] doing."

The court found clear and convincing evidence that OCS had made active efforts at maintaining or reuniting the family since K.M.'s birth and these efforts had proven unsuccessful. These efforts included services for D.A.M. when he became K.M.'s primary caregiver in 2013. The court noted that from 2013 to 2016, OCS provided "referrals to supportive services and safety planning" and that OCS continued offering services once it took custody of K.M. in 2016. The court also found that when K.M.'s aunt sought to be removed as guardian in 2019, OCS continued trying to provide both parents and K.M. with services to address their needs and attempt reunification. The court found that most of these efforts focused on trying to get the parents to engage, but D.A.M. "never met with OCS, engaged in case planning, or engaged in regular contact with [K.M.]."

The court found that OCS had provided evidence beyond a reasonable doubt, including the testimony of a qualified expert witness, that continued custody by either parent was likely to result in serious emotional or physical damage to K.M. The

---

[12]   *Edna L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 477 P.3d 637, 649-50 (Alaska 2020) (Stowers, J., concurring).

court emphasized that while there were concerns with D.A.M.'s alleged substance abuse, it was "his lack of effort and involvement in [K.M.'s] life [that was] particularly troublesome." And it determined by a preponderance of evidence that it was in K.M.'s best interests to terminate parental rights. The superior court therefore terminated both parents' parental rights.

D.A.M. appeals,[13] arguing that the superior court erred by finding he had abandoned K.M., that he failed to remedy his substance abuse, and that OCS had made active efforts to reunite the family.

## III. STANDARD OF REVIEW

In a CINA case, we review the superior court's findings of fact, including whether a parent has failed to remedy the conduct that placed the child at substantial risk, for clear error.[14] "[F]indings are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party leaves us with a definite and firm conviction that a mistake has been made."[15] We review de novo whether the superior court's factual findings satisfy the requirements of the CINA rules and ICWA."[16] "Whether [OCS] complied with the 'active efforts' requirement of [ICWA] is a mixed question of law and fact."[17]

---

[13]    K.J. did not appeal.

[14]    *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1111 (Alaska 2010).

[15]    *Marcia V. v. State, Off. of Child.'s Servs.*, 201 P.3d 496, 502 (Alaska 2009).

[16]    *Sam M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

[17]    *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 (continued...)

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err By Finding D.A.M. Abandoned K.M.

D.A.M. argues the superior court clearly erred by finding he abandoned K.M., claiming that "he provided sustained periods of parental care and support throughout [K.M.'s] life," including being K.M.'s primary caregiver from March 2013 until July 2016 and again in February and March 2018. D.A.M. argues that his lack of engagement with OCS does not prove that he failed to maintain contact with K.M., since he found other "ways to stay involved in [K.M.'s] life through his own initiative, without OCS's involvement," such as visiting the foster home and attending K.M.'s football game. Gaps in his involvement, D.A.M. argues, were due to a lack of resources and other factors such as his belief OCS closed its office during COVID. And he now argues that he could not have participated in a reunification plan because OCS did not provide him with one after K.M. was placed with the foster family.

Alaska Statute 47.10.013 defines abandonment and lists specific examples of abandonment that can support a finding that a child is in need of aid.[18] We have previously held that "prolonged absences and failure to regularly visit or communicate with" the child and a "failure to meaningfully participate in OCS's case plan" without justifiable cause meet the statutory definition of abandonment.[19]

---

[17] (...continued)
P.3d 543, 550 (Alaska 2017) (second alteration in original) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[18] *See Steve H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 109, 112 (Alaska 2019).

[19] *Id.* at 113-14; *see* AS 47.10.013(a) (listing examples of parental (continued...)

The record amply supports the superior court's abandonment finding. D.A.M. did not regularly visit or communicate with K.M.[20] and made minimal efforts to do so.[21] As OCS points out, D.A.M.'s sporadic interactions with K.M. were merely "token efforts"[22] amidst extended periods without contact.[23] The superior court reasonably concluded that D.A.M. made a "choice not to engage." D.A.M.'s care for K.M. in 2013 and for a short period in 2018, and his two spontaneous visits to K.M.'s foster home, are "isolated facts" that do not persuade us the superior court clearly erred by finding D.A.M. abandoned K.M.[24] In addition to his failure to visit or communicate

---

[19]    (...continued) abandonment).  D.A.M. argues that the two-part common law test for assessing abandonment under the statute was not met.  The State correctly counters that we apply the statutory test rather than the outdated two-part common law approach.

[20]    *See* AS 47.10.013(a)(3).

[21]    *See* AS 47.10.013(a)(2).

[22]    *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 336-37 (Alaska 2011) (quoting *Jeff A.C., Jr. v. State*, 117 P.3d 697, 704 (Alaska 2005)) (affirming superior court's determination that father's limited and irregular communication with child and with OCS were merely "token efforts" and thus father's actions constituted abandonment and failure to remedy abandonment).

[23]    *Cf. Steve H.*, 444 P.3d at 115 (rejecting father's excuses such as busy work schedule or deaths in the family because they could account only for some missed visits, not for a failure "to maintain communication or contact with his son for significant periods of time").

[24]    *Sean B.*, 251 P.3d at 337 (holding "isolated facts" such as father's occasional communication attempts or irregular engagement with OCS insufficient to overturn finding of failure to remedy abandonment); *see also Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) ("Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's
(continued...)

with K.M., D.A.M. failed to participate in a case plan or a reunification program by avoiding OCS for years.[25] D.A.M. was aware that OCS was trying to contact him and he had several means to contact them. But he made no effort to take any steps in his case plan, either by engaging in regular visitation or providing regular urinalyses or hair follicle testing to demonstrate ongoing sobriety following his treatment in 2017.[26]

The record also provides ample evidence that D.A.M. did not remedy his abandonment. When considering whether a condition that caused a child to be a child in need of aid has been remedied,

> the court may consider any fact relating to the best interests of the child, including
>
> > (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
> >
> > (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
> >
> > (3) the harm caused to the child;
> >
> > (4) the likelihood that the harmful conduct will continue; and
> >
> > (5) the history of conduct by or conditions created by the parent.[27]

The superior court noted that D.A.M.'s "pattern of abandonment" had not changed,

---

[24] (...continued) ruling.").

[25] *See* AS 47.10.013(a)(4).

[26] *See Dale H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 235 P.3d 203, 211 (Alaska 2010) (affirming finding that father's failure to comply with urinalyses or state-approved domestic violence courses in case plan relevant to abandonment finding).

[27] AS 47.10.088(b).

pointing to his failure to regularly communicate with K.M. or "provide the kind of consistent, reliable contact a child needs from a caregiver," and his "refus[al] to engage with OCS." These failures demonstrate D.A.M. made no effort to show OCS that he had addressed any of its safety concerns.[28] The court also found that D.A.M. had failed to make efforts to understand his behavior's impact on K.M. or to demonstrate he could take care of K.M.[29] The superior court's findings regarding all five statutory factors demonstrate D.A.M.'s failure to remedy his abandonment of K.M. The superior court did not clearly err by finding that D.A.M. had abandoned K.M. and had failed to remedy that abandonment.[30]

---

[28] *See Dale H.*, 235 P.3d at 211 (affirming finding that father failed to remedy abandonment by not taking any case plan steps).

[29] In response to the court's statement that D.A.M.'s excuses regarding his lack of stable housing were unpersuasive because they were "in large part [D.A.M.'s] doing," D.A.M. rightly argues that "homelessness does not constitute abandonment." *See* AS 47.10.019 ("[T]he court may not find a minor to be a child in need of aid . . . solely on the basis that the child's family is poor [or] lacks adequate housing . . . ."). But the superior court did not find that D.A.M. had abandoned K.M. by being homeless. D.A.M. admitted he had not even attempted to find suitable housing or employment, and he acknowledged he could not currently care for K.M. under those circumstances. The superior court appropriately pointed to D.A.M.'s lack of effort to obtain housing as evidence that he failed to make serious attempts to become better able to meet K.M.'s needs. *See Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 430 (Alaska 2012) (explaining AS 47.10.019 allows consideration of parent's economic situation as evidence of failure to cooperate with OCS about financial situation rather than of failure to support children); *see also Damon W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-16739, 2018 WL 1357357, at *5 (Alaska Mar. 14, 2018) (clarifying "[h]omelessness alone cannot disqualify someone from parenting, but a parent's poor housing choices — when there are choices — are relevant" (footnote omitted)).

[30] Because we affirm the termination of D.A.M.'s parental rights based on
(continued...)

## B. The Superior Court Did Not Err By Finding OCS Made Active Efforts.

D.A.M. also challenges the superior court's active efforts finding. ICWA requires that a "party seeking to effect a . . . termination of parental rights to[] an Indian child . . . [prove] that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[31] Current Bureau of Indian Affairs regulations define active efforts as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[32] Active efforts must be determined "on a case-by-case basis because 'no pat formula' exists for distinguishing between active and passive efforts."[33] Generally, efforts are passive "where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition"; efforts are active "where the state caseworker takes the client

---

**30** (...continued)
abandonment we do not address the substance abuse issue. "[O]nly one statutory basis is sufficient for finding a child to be in need of aid in a termination proceeding." *Dale H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 235 P.3d 203, 211 (Alaska 2010).

**31** 25 U.S.C. § 1912(d); *see also* 25 C.F.R. § 23.120(a) (2021). Furthermore, "[a]ctive efforts must be documented in detail in the record." 25 C.F.R. § 23.120(b) (2021); *see also Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 981-82 (Alaska 2019).

**32** 25 C.F.R. § 23.2 (2021).

**33** *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013) (quoting *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)); *see also* 25 C.F.R. § 23.2 (2021) ("Active efforts are to be tailored to the facts and circumstances of the case . . . .").

through the steps of the plan,"[34] such as by helping the parents "identify appropriate programs and complete the necessary paperwork to apply" or "connect[ing] them to other resources" rather than simply providing referrals.[35] "[T]he superior court may consider '[OCS's] involvement *in its entirety*' in evaluating active efforts,"[36] which include efforts made toward that parent throughout the entire case as well as toward reunifying the child with the family.[37]

D.A.M. argues that OCS's efforts were "inadequate" because it never contacted him before trial and did not provide any services after 2019. He also argues that OCS failed to take every feasible step to reach him such as asking the police to notify OCS if they encountered D.A.M. or providing him with a phone. D.A.M. asserts that his "failure to engage" with OCS was justified by the inadequacy of OCS's efforts and his own lack of resources.

We are not persuaded. OCS has a duty to make active efforts overall, but it also "has discretion to prioritize which services should be provided to a parent based upon the issues identified in [the] case," with the best interests of the child in mind.[38] OCS is not necessarily required, for example, to make referrals to a specific program a

---

[34]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 271 (Alaska 2011) (quoting *Dale H.*, 235 P.3d at 213).

[35]     *Bill S.*, 436 P.3d at 982.

[36]     *Philip J.*, 314 P.3d at 528 (emphasis added) (quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1114 (Alaska 2010)).

[37]     *See, e.g.*, *Josh L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 457, 463-64 (Alaska 2012) (allowing efforts made toward non-incarcerated parent to count toward reunification efforts).

[38]     *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1071 n.25 (Alaska 2018).

parent requests[39] or provide material assistance such as a phone.[40] OCS's choices need only be reasonable, not perfect.[41]

OCS provided services to the family before K.M. was born and continued providing services to those family members it was able to reach. Caseworkers testified about the services provided throughout OCS's involvement with the family beginning with contact before K.M. was born. In addition to case planning and visits, OCS made referrals and offered assistance for substance abuse and mental health services, coordinated with the Tribe to provide services, drafted both in-home and out-of-home safety plans, and after those failed, looked for suitable placements for K.M. with other family members. Caseworkers testified they made repeated and extensive efforts to contact D.A.M. These efforts included calling last known phone numbers, sending letters to last known addresses in Juneau and Sitka, and asking D.A.M.'s family — as well as local law enforcement and his lawyer's office — to notify D.A.M. that OCS was looking for him and also to provide OCS with D.A.M.'s contact information. D.A.M. testified that he knew OCS was trying to reach him but did not make any effort to get in contact with OCS. Active efforts do not require OCS to exhaust every conceivable

---

[39] *Philip J.*, 314 P.3d at 529-30.

[40] *See Vale T. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-17987, 2021 WL 5919014, at *8 (Alaska Dec. 15, 2021) (concluding no error in active efforts finding where superior court found that OCS's failure to provide father with a phone would not have improved his communication with OCS).

[41] *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011); *see also Philip J.*, 314 P.3d at 529 (concluding "OCS was not unreasonable in its approach" to individual treatment decisions and that active efforts were made overall).

means of engaging a parent in its effort to reunify a family,[42] particularly when the parent admits he was aware of and did not respond to OCS's efforts to reach him.

Even if D.A.M. is correct that different approaches could have been helpful to engage him, "the superior court may consider 'the state's involvement in its entirety' in evaluating active efforts."[43] OCS worked to keep K.M. with his family, turning first to in-home and then out-of-home safety plans, and seeking placements within his family. When D.A.M. was caring for K.M. in 2013, OCS assisted him by supplying diapers, clothing, and bus passes as well as arranging for in-home early learning program services. After K.M. was placed in foster care in 2019, OCS worked with K.J. to address her substance abuse and parenting issues and tried to contact D.A.M. to provide similar services to him. Considered in their entirety, OCS's efforts crossed the threshold from passive to active.

Finally, a parent's engagement with services is relevant to OCS's active efforts.[44] While a parent's lack of cooperation does not excuse OCS from continuing to make active efforts, "it can influence what actions qualify as active efforts."[45] D.A.M. was not simply reluctant to engage with some OCS services; he refused to contact

---

[42]     *Pravat P.*, 249 P.3d at 272 (rejecting father's argument that OCS failed to make active efforts when it did not provide specific services because "the active efforts requirement does not require perfection").

[43]     *Philip J.*, 314 P.3d at 528 (Alaska 2013) (quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1114 (Alaska 2010)) (affirming active efforts finding despite father identifying lapses by OCS, noting "superior court [is] not required to make particular findings as to . . . each component of the case plan").

[44]     *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 562-63 (Alaska 2022).

[45]     *Id.*

caseworkers even when he knew that they were looking for him and that engagement was required to reunite with his son. OCS nonetheless continued trying to contact him through different avenues in order to provide services and arrange for visitation, but D.A.M.'s lack of cooperation made the "provision of services practically impossible."[46] He cannot therefore point to OCS's inability to provide him with services after 2019 as a failure to make active efforts. The superior court did not err when it determined that OCS's efforts amounted to active efforts.

## V. CONCLUSION

The superior court's termination of D.A.M.'s parental rights is AFFIRMED.

---

[46] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 433 (Alaska 2015) (quoting *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).